**GREENBRIER (LAKE COUNTY TRUST COMPANY NO. 1391), an Indiana General Partnership, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

Nos. 96–326C, 96–364C, 96–435C, 96–697C.

United States Court of Federal Claims.

April 9, 1998.

R. Carter Sanders, Washington, DC, for plaintiffs.

Brian M. Simkin, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Leslie Macchiarella, United States Department of Housing and Urban Development, of counsel.

## OPINION

MEROW, Judge.

Plaintiffs, 249 owners of low and moderate income housing, claim that they entered into contracts with the U.S. Department of Housing and Urban Development (HUD) whereby HUD agreed to provide mortgage insurance and other benefits to plaintiffs to facilitate the development of such housing in exchange for plaintiffs' promise to maintain affordability restrictions on that housing for 20 years. Plaintiffs argue that defendant breached those contracts when it enacted federal legislation which effectively extended those af-

fordability restrictions beyond that 20–year time period. Alternatively, plaintiffs claim that this legislation gave rise to a taking under the Fifth Amendment to the U.S. Constitution. This matter is now before the court on dispositive motions. The principal issues raised by this claim are whether plaintiffs secured a contract right from defendant to terminate those affordability restrictions after 20 years, or, if not, whether defendant's extension of those affordability restrictions gave rise to a taking of property under the Fifth Amendment to the U.S. Constitution.

Plaintiffs base their contract claim upon the various documents pursuant to which the affordable housing properties at issue in this case were constructed and are now operated. Plaintiffs locate part of the purported contractual promise in their mortgage notes with private lenders which permit plaintiffs to prepay those government-insured 40–year notes after 20 years without HUD's consent. Plaintiffs locate the remainder of the purported promise in their regulatory agreements with HUD whereby plaintiffs promised to maintain the affordability restrictions on their properties for as long as the government mortgage insurance was in effect. Although HUD did not sign the notes containing the prepayment term, plaintiffs claim that these documents together embody a three-party contract between HUD, the private lenders and plaintiffs, and that the 20–year prepayment term in the notes evidences plaintiffs' bargained for promise to maintain affordability restrictions for 20 years and HUD's promise to lift those restrictions at the expiration of that time period.

Plaintiffs conclude that defendant breached this term of the contract when it enacted federal legislation restricting plaintiffs' ability to prepay their mortgages after 20 years.

In the alternative, plaintiffs maintain that the federal legislation extending the affordability restrictions gave rise to the taking of a vested contract right to terminate the affordability restrictions after 20 years and to operate their properties free of federal regulation. In such a case, plaintiffs argue, the Fifth Amendment to the U.S. Constitution entitles them to an award of just compensation.

It is decided that plaintiffs did not secure a contract right from defendant to prepay their government-insured mortgages after 20 years as neither the relevant documents, nor the context of their execution, indicate that such a right was secured. While HUD had a contract of insurance with the private lenders to insure plaintiffs' mortgages, HUD was not a party on the notes containing the prepayment term, *see Housing Corp. of America v. United States*, 199 Ct.Cl. 705, 709, 468 F.2d 922, 924 (1972) (no privity of contract on document where government not identified as party to document); *National Leased Hous. Ass'n v. United States*, 32 Fed.Cl. 454, 460 (1994) (*NLHA III*) (same), *aff'd*, 105 F.3d 1423 (Fed.Cir.1997) (*NLHA V*), and the regulatory agreement between HUD and plaintiffs did not incorporate the terms of the note. *See, e.g., Winstar Corp. v. United States*, 64 F.3d 1531, 1536 (Fed.Cir.1995) (en banc) (*Winstar IV*) (binding government to term not contained in its agreement with plaintiff thrifts but present in contemporaneously executed documents where agreement expressly incorporated those documents). Moreover, the context of these transactions does not support the finding that HUD entered into a contract with plaintiffs with respect to prepayment. *See, e.g., United States v. Winstar Corp.*, 518 U.S. 839, 853–55 & n. 9, 116 S.Ct. 2432, 2445 & n. 9, 135 L.Ed.2d 964 (1996) (*Winstar V*) (lack of provision for contested term in governing regulations supports finding of contractual agreement as to term); *Winstar IV*, 64 F.3d at 1536 (heavily negotiated context supports finding of contractual agreement as to contested term); *Winstar Corp. v. United States*, 21 Cl.Ct. 112, 115 (*Winstar I*) (underlying transaction irrational unless contested term was intended subject of contractual agreement).

Here, the prepayment term was prescribed by HUD regulations, those regulations noted that such terms were subject to amendment, and the underlying transactions between HUD and plaintiffs cannot be characterized as irrational or illogical absent a contractual agreement concerning prepayment. Neither the documentation nor the context of these transactions evince the "type

of direct, unavoidable contractual liability necessary to trigger a waiver of sovereign immunity ... [which is] the inevitable result of finding privity of contract." *NLHA V,* 105 F.3d at 1435.

Even if plaintiffs and HUD enjoyed privity of contract with respect to the prepayment term, that term cannot be characterized as a promise by plaintiffs to maintain the affordability restrictions for a period of 20 years and a promise by HUD to lift those restrictions at the expiration of that 20–year time period. Notwithstanding plaintiffs' characterization of the prepayment term, at the time of the transactions plaintiffs had the right to terminate the government insurance, and thereby the affordability restrictions, without the consent of HUD at any time. 24 C.F.R. § 207.253 (1973) (providing for termination of mortgage insurance without HUD's consent by voluntary agreement of owners and lenders); *Johnson v. HUD,* 911 F.2d 1302, 1303 (8th Cir.1990) (applying 24 C.F.R. § 207.253). Moreover, the prepayment term does not reflect an unmistakable promise by defendant to afford plaintiffs a particular course of future regulatory treatment. *See Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment,* 477 U.S. 41, 52–53, 106 S.Ct. 2390, 2396–97, 91 L.Ed.2d 35 (1986) (*POSSE* ) (waiver of sovereign immunity must be unmistakable); *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1579 (Fed.Cir. 1997) (unmistakability doctrine applies to breach of contract claim for damages).

As it is decided that plaintiffs did not secure a contract right from defendant to terminate the affordability restrictions, plaintiffs cannot state a takings claim on the theory that the federal legislation took such a contract right. While plaintiffs complaint may, however, be read to state a claim that the federal restrictions on the use of their property gave rise to a taking of that property, *see Penn Central Transportation Co. v. New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), that claim is not ripe for review. *See Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997). The federal legislation which forms the basis of plaintiffs' challenge at all times provided that plaintiffs could seek HUD approval to terminate or modify the affordability restrictions. While plaintiffs do not maintain that they have applied for such approval, they claim that they should be excused from doing so on the ground that such application would be futile. *See MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 350 n. 9, 106 S.Ct. 2561, 2568 n. 9, 91 L.Ed.2d 285 (1986). In particular, plaintiffs maintain that such application would be futile because they could not satisfy the stringent statutory criteria HUD was bound to apply to their termination requests.

Plaintiffs' reliance upon the futility exception to the ripeness requirements applicable to their takings claim is misplaced. The futility exception may be applied in certain situations to excuse a property owner from utilizing variance or other similar procedures after a government denial of a proposed use, but not to excuse a property owner from applying for permission to engage in the proposed use as an initial matter. *See United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 126–27, 106 S.Ct. 455, 458–59, 88 L.Ed.2d 419 (1985) (requirement that person obtain permit before engaging in use of property does not take the property in any sense). Even were the futility exception applicable here, the fact that plaintiffs' prepayment requests would be evaluated pursuant to rigorous statutory criteria, without more, is not enough to render compliance with those procedures futile. *Heck v. United States,* 37 Fed.Cl. 245, 252 (1997) ("[E]ven if plaintiff showed an objective probability of denial on the merits ... the application process could not thereby be characterized as 'futile'.... A plaintiff cannot plead futility whenever faced with long odds or demanding procedural requirements."), *aff'd,* 134 F.3d 1468 (Fed.Cir.1998).

Accordingly, since plaintiffs did not secure a contract right from defendant to terminate the affordability restrictions after 20 years, plaintiffs' motion for summary judgment on their breach of contract claim is denied, and defendant's motion on that claim is granted. Further, because plaintiffs did not apply to HUD as provided by law in order to determine whether and to what extent the afforda-

bility restrictions at issue in this case would be required to be retained under that law, defendant's motion for summary judgment on plaintiffs' takings claim is granted.

## FACTS

Plaintiffs here, 249 owners of low to moderate income housing,[1] like the plaintiffs in *Cienega Gardens v. United States*, 33 Fed.Cl. 196 (1995) (*Cienega I*), appeal docketed, No. 97–5126 (Fed.Cir.1997) and *Lurline Gardens Ltd. Housing Partnership v. United States*, 37 Fed.Cl. 415 (1997), base their contract and takings claims upon their participation in the federal housing programs authorized under section 221(d)(3) and section 236 of the National Housing Act of 1934 (NHA), as amended. 12 U.S.C. §§ 1715*l*(d)(3), 1715z–1. By these NHA programs, Congress aimed to increase the supply of low to moderate income rental housing by providing incentives to private industry to construct and operate such housing.

Congress did so under the NHA by authorizing HUD to enter into contracts of mortgage insurance with private lenders upon the application of lenders to HUD to insure a mortgage between those lenders and private developers and owners of such housing.[2] The government also provided interest reduction payments to the lenders on behalf of the owners. These government benefits effectively converted what would have been a market-rate mortgage on the owner's property into a 1% loan. In return for these benefits, the owners entered into regulatory agreements with HUD.[3] In the regulatory agreement, the owners promised to maintain affordability restrictions on the properties for as long as HUD's insurance continued in effect.[4]

According to the regulations then in effect, the government's insurance, and thereby the affordability restrictions contained in the regulatory agreement, could be terminated in two ways:

> § 207.253 **Termination by prepayment and voluntary termination.**
>
> All rights under the insurance contract and all obligations to pay future insurance pre-

1. On October 20, 1997, plaintiffs moved to remove parties to case number 96–326C (Guarantee Loan and Real Estate Inc., Mayfair Apartments and Oakwood Terrace Apartments) from this case without prejudice pursuant to RCFC 41. While RCFC 41(a)(1) permits voluntary dismissal by the plaintiff without leave of the court at any time before service of the answer or a response (whichever occurs first), the rule provides that after that time "an action shall not be dismissed at the plaintiff's insistence save upon order of the court and upon such terms and conditions as the court deems proper." The purpose of subsection (a)(2) "is to discourage, in appropriate cases, a voluntary dismissal without prejudice, which would permit a plaintiff to refile at a later time ... with a consequent imposition on limited judicial resources." *MacDonald & Evans, Inc. v. United States*, 2 Cl.Ct. 325, 327 (1983). Accordingly, in view of the purpose of subsection (a)(2), and the fact that the dispositive motions in this case had been fully briefed and argued by October 20, 1997, plaintiffs' motion to remove the above-referenced parties is denied.

2. If HUD approved of that application, it would issue a "firm commitment" signifying that approval, and setting forth the terms and conditions under which the mortgage would be insured. 24 C.F.R. § 221.509(a)(3). When the conditions of the mortgage insurance commitment were met, the lender would return the commitment to HUD with its request for HUD's endorsement for insurance. HUD would then indicate its insurance of the mortgage by endorsing the credit instrument; that is, the deed of trust note. *See* 24 C.F.R. § 207.254(a) (1978).

3. There were three principal documents executed to effect the transactions at issue in this case: (1) a deed of trust note; (2) a rider to the deed of trust note containing the prepayment term; (3) and a regulatory agreement. As the rider to the deed of trust note containing the prepayment term was expressly incorporated into the note, all references to "note" herein refer to the note and the incorporated rider with its prepayment term. Plaintiffs aver that the purported contractual obligations reflected in the documents provided to this court are representative of all 249 plaintiffs in the above-captioned claim.

4. The standard language in these regulatory agreements between HUD and the owners read:

> In consideration of the endorsement for insurance by the Commissioner of the above described note ..., and in order to comply with the requirements of Section 236 of the National Housing Act, as amended, and the Regulations adopted by the Commissioner pursuant thereto, Owners agree ... that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect ... [the owners shall maintain enumerated affordability restrictions].

*E.g.*, Def.App. at 00140.

miums shall terminate on the following conditions:

(a) *Termination by prepayment.* Notice of the prepayment in full of the mortgage or loan shall be given to the Commissioner, on a form prescribed by the Commissioner, within 30 days from the date of prepayment. The insurance contract shall terminate, effective as of the date of prepayment. . . .

(b) *Termination by voluntary agreement.* Receipt by the Commissioner of a written request, by the mortgagor and mortgagee or lender for the termination of the insurance on the mortgage or loan, on a form prescribed by the Commissioner, accompanied by the original credit instrument for cancellation of the insurance endorsement and the remittance of all sums to which the Commissioner is entitled. The termination shall become effective as of the date these requirements are met. . . . [5]

24 C.F.R. § 207.253 (1973). If an owner and lender reached an agreement pursuant to section 207.253(b), HUD would terminate the insurance and the affordability restrictions contained in the owner's regulatory agreement. *See Johnson,* 911 F.2d at 1303.

As provided in section 207.253(a), the other avenue to terminating the mortgage insurance, and thereby the affordability restrictions, was to pay the underlying mortgage. Owners' ability to prepay such mortgages before the expiration of their 40–year term was also governed by HUD regulations:

**236.30 Prepayment Privileges.**

(a) *Prepayment in full*—(1) *Without prior Commissioner consent.* A mortgage indebtedness may be prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner where the mortgagor is a limited distribution type and either of the following conditions is met:

(i) If the prepayment occurs after the expiration of 20 years from the date of the final insurance endorsement of the mortgage, provided the mortgagor is not receiv-

ing payments from the Commissioner under a rent supplement contract executed pursuant to the provisions of §§ 5.1 et seq. of this title.

(ii) If the prepayment occurs as a result of the sale of the project to a cooperative or private nonprofit corporation or association, provided the sale is financed with a mortgage insured pursuant to § 236.40(d).

The mortgage notes between the lenders and the owners effectively repeated this prepayment regulatory provision:

The debt evidenced by this Note may not be prepaid either in whole or in part prior to the final maturity date hereof without prior written approval of the Federal Housing Commissioner except where . . . (2) The maker is a limited dividend mortgagor which is not receiving payments from the Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965, and the prepayment occurs after the expiration of 20 years from the date of final endorsement. . . .

*E.g.,* Def.App. at 00156.

While the regulations assured the lenders that HUD would not modify the regulations in a manner which would adversely affect their interests under their insurance contracts with HUD, no such provision was made with respect to owners:

**236.249 Effect of amendments.**

The regulations in this subpart may be amended by the Commissioner from time to time, in whole or in part, but such amendment shall not adversely affect the interests of a mortgagee or lender under the contract of insurance on any mortgage or loan already insured and shall not adversely affect the interests of a mortgagee or lender on any mortgage or loan to be insured on which the Commissioner has made a commitment to insure.

*See also* 24 C.F.R. § 221.749 (identical language for section 221(d)(3) program).

---

5. The "Commissioner" refers to the Federal Housing Commissioner, who was the head of the Federal Housing Administration (FHA), the original agency in charge of administering NHA pro-

grams. 24 C.F.R. §§ 200.1, 200.40 (1978). In 1965, the Commissioner's functions were assumed by the Secretary of HUD. 24 C.F.R. § 200.2.

Neither the notes between the lenders and owners, nor the regulatory agreements between the owners and HUD, prevented the lender and owner from mutually agreeing to terminate the mortgage insurance. Thus, if the owner could secure the consent of the lender, the owner could terminate the government-insurance, and thereby the affordability restrictions contained in the regulatory agreement, without the consent of HUD at any time.

As the 20–year prepayment date approached for many of these federally-financed affordable housing properties, Congress became concerned that owner prepayments, and the accompanying termination of the affordability restrictions, could lead to a shortage of affordable housing. In order to forestall this possibility, Congress enacted the Emergency Low Income Housing Preservation Act of 1987 (ELIHPA). Pub.L. No. 100–242, title II, 101 Stat. 1877–86 (1988) (*reprinted at* 12 U.S.C. 1715*l* note (1994)). ELIHPA placed temporary restrictions on the ability of owners to prepay their government-insured mortgages while Congress considered this potential problem.

Under ELIHPA, owners seeking to terminate the affordability restrictions were required to file a notice of intent and plan of action with HUD so requesting. Congress provided that HUD could only approve such a plan of action if (1) it would not "materially increase economic hardship for current tenants" or "involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available" and (2) the "supply of vacant, comparable housing" would be sufficient to ensure that prepayment would not "materially affect" the availability of such housing for lower income families. 101 Stat. 1880. Congress also authorized HUD to offer owners who did not prepay additional financial incentives.

Retaining the essential features of ELIHPA, Congress replaced this temporary measure with the Low–Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA). Pub.L. No. 101–625, title VI, 104 Stat. 4249 (codified at 12 U.S.C. §§ 4101–4147 (1994)). LIHPRHA expanded the financial incentive features of ELIHPA, and required prepaying owners to provide assistance for tenants displaced by the termination of the affordability restrictions. 12 U.S.C. § 4113(b)–(c). As a result of this legislation, eight properties in the section 221(d)(3) and 236 programs were the subject of prepayment requests. Owners of three of those eight properties have prepaid, withdrawing from these NHA programs. See Malloy Decl. ¶ 6.

Due to the excessive costs of LIHPRHA, attributed in large measure to the inefficiency of offering additional financial incentives to all owners regardless of intent to prepay, *see* H.R.Rep. No. 104–120, at 145 (1995) ("[T]he incentives being offered are awarded to owners who may have no intention of prepaying the mortgages. In general, in today's real estate market, the prospect of widespread prepayment is unlikely."), Congress enacted the Housing Opportunity Program Extension Act of 1996 (HOPE), Pub.L. No. 104–120, § 2, 110 Stat. 834 (March 28, 1996). HOPE provides that owners may prepay their mortgages without prior HUD approval, so long as the owners agree not to raise rents for 60 days.

Notwithstanding the enactment of HOPE, scores of owners brought suit in this court claiming that defendant, through the enactment of ELIHPA and LIHPRHA, breached its contracts with them by burdening their "unfettered right" to prepay the government-insured mortgages after 20 years, and thereby terminate the affordability restrictions contained in their regulatory agreements with HUD. This claim is currently the subject of a conflict of opinion within this court. In *Cienega I*, the court found that privity of contract existed between HUD and the owners as to the prepayment term, 33 Fed.Cl. at 210, relying primarily upon the Restatement principle that "all writings that are part of the same transaction are interpreted together." Restatement (Second) of Contracts, § 202. The court went on to rule that the enactment of ELIHPA and LIHPRHA gave rise to a breach of contract, rejecting the government's sovereign acts and unmistakability defenses to that claim. In *Lurline*

*Gardens,* the court concluded that the Restatement had been misapplied in *Cienega I,* and found that no privity of contract existed between HUD and the owners with respect to prepayment rights. *Lurline Gardens,* 37 Fed. Cl. at 420. Accordingly, the court in *Lurline Gardens* found no breach.[6]

## ANALYSIS

Plaintiff moves for summary judgment on the breach of contract claim, arguing that no genuine issues of material fact surround the resolution of their claim, and that judgment may therefore be entered as a matter of law. RCFC 56(c). Material facts are those which will significantly affect the outcome of a suit under the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Defendant moves to dismiss the breach claim, and also moves for summary judgment on plaintiffs' takings claim on the ground that any such claim is unripe.

### I. Breach of Contract Claim

Plaintiffs maintain that they entered into contracts with HUD whereby they agreed to construct and operate housing properties according to government affordability restrictions for 20 years in exchange for government insurance and other benefits which enabled the construction and operation of those properties. Plaintiffs locate this critical promise in the various documents pursuant to which their affordable housing properties were built and are now operated. Part of that promise, according to plaintiffs, is memorialized in the mortgage notes for the properties which allow plaintiffs to prepay those government-insured 40–year notes after 20 years. The remainder of that promise, plaintiffs maintain, is found in their regulatory agreements with HUD whereby plaintiffs promised to maintain the affordability restrictions on their properties for as long as the government insurance was in effect.

The effect of finding privity of contract between HUD and plaintiffs as to the prepayment term is to find a waiver of sovereign immunity. That is, since the Tucker Act provides a waiver of sovereign immunity from suit for a claim "based upon [an] express contract with the United States," 28 U.S.C. § 1491(a)(1) (1994), the result of finding privity of contract is to find an expression of a waiver of sovereign immunity. *NLHA V,* 105 F.3d at 1435. As such waivers are to be narrowly construed, *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607 (1980); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976), such privity must be "a direct and unavoidable conclusion" under the circumstances of this case. *NLHA V,* 105 F.3d at 1435.

#### a. Background: Federal Housing Legislation

National housing policy has as its goal providing "a decent home and a suitable living environment for every American family." 42 U.S.C. § 1441. After courts struck early federal attempts to directly construct such housing for low to moderate income families,[7] Congress resorted to incentives in order to increase the supply of such housing. Congress targeted incentives both to states and

---

6. The HUD programs at issue in this case have been the subject of several related claims in this court: *Alder Terrace, Inc. v. United States,* 39 Fed.Cl. 114 (1997) (dismissing breach of contract claim on statute of limitations grounds); *Cienega Gardens v. United States,* 38 Fed.Cl. 64 (1997) (*Cienega III*) (damages opinion on *Cienega I* and *Cienega II*); *Corby Homes Partnership v. United States,* 38 Fed.Cl. 204 (1997) (dismissing breach of contract claim brought by owners seeking incentives under ELIHPA and LIHPRHA); *Cienega Gardens v. United States,* 37 Fed.Cl. 79 (1996) (*Cienega II*) (granting summary judgment to new plaintiffs raising same breach of contract claim argued in *Cienega I*); *Anaheim Gardens v. United States,* 33 Fed.Cl. 24 (1995) (dismissing takings claim based upon HUD's delay in promulgating LIHPRHA regulations).

7. Courts held that the federal government could not use the power of eminent domain to acquire the property necessary for the development of such housing because the provision of such housing was not a public purpose within the meaning of the Fifth Amendment. *E.g., United States v. Certain Lands in Louisville, Jefferson County, Ky.,* 78 F.2d 684 (6th Cir.1935), *cert. granted,* 296 U.S. 567, 56 S.Ct. 154, 80 L.Ed. 400 (1935), *appeal dismissed,* 297 U.S. 726, 56 S.Ct. 594, 80 L.Ed. 1009 (1936).

their political subdivisions, 42 U.S.C. § 1437 (federal incentives to "assist the several States and their political subdivisions to remedy the ... acute shortage of decent, safe, and sanitary dwellings for families of lower income"), and to private industry. 12 U.S.C. § 1715*l*(a) (federal incentives to "assist private industry in providing housing for low and moderate income families and displaced families").

Congress accomplished the first objective through section 8 of the United States Housing Act of 1937, as amended, Pub.L. No. 75–412, 50 Stat. 888 (codified as amended at 42 U.S.C. §§ 1437–1437aaa–7 (1994 & West Supp.1998)). Section 8 authorized HUD to enter into contracts with local public housing authorities (PHAs) by which HUD would agree to finance the construction of such housing, and the PHA would agree to certain restrictions designed to maintain the property as low income housing:

> The Secretary may make annual contributions to public housing agencies to assist in achieving and maintaining the lower income character of their projects. *The Secretary shall embody the provisions for such annual contributions in a contract guaranteeing their payment.*

42 U.S.C. § 1737c(a)(1) (emphasis added); *see also* 42 U.S.C. § 1737g(a)(1)(A) ("The Secretary shall embody the provisions for such annual contributions in a contract guaranteeing their payment...."). The local PHA would then enter into "housing assistance payments contracts" (HAPs) with private owners or developers of such housing. Only in the case where no local PHA was in existence in a given locale was HUD authorized to enter into HAP contracts directly with owners. 42 U.S.C. § 1437f(b)(1). Congress also prescribed the conditions under which the federal incentives would be granted, providing that a HAP contract between the PHA and owner would be required to include certain terms regarding the calculation and adjustment of rents. 42 U.S.C. § 1437f(c).

Congress accomplished the second objective of assisting private industry provide such housing by enacting the housing programs at issue in this case. Through section 221(d)(3) of the National Housing Act of 1934, as amended, HUD was authorized to provide owners with below market-rate mortgages. Section 221(d)(3) was replaced by section 236 for mortgages entered into after 1968, and authorized HUD to make interest reduction payments to private sector lenders on behalf of owners, 12 U.S.C. § 1715z–1(a), and to insure such mortgages, 12 U.S.C. § 1715*l* (b), effectively converting the mortgage into a 1% loan:

> For the purpose of reducing rentals for lower income families, *the Secretary is authorized to make, and to contract to make, periodic interest reduction payments on behalf of the owner* of a rental housing project designed for occupancy by lower income families, *which shall be accomplished through payments to mortgagees* [lenders] holding mortgages meeting the special requirements specified in this section.

12 U.S.C. § 1715z–1(a) (emphasis added).

As in the case of the section 8 program, Congress provided that for a mortgage between a lender and owner to be eligible for section 236 assistance, the lender and owner would be required to meet certain conditions. 12 U.S.C. § 1715*l*. Congress also specified that under the mortgage, the owner would be subject to regulation:

> under Federal or State laws or by political subdivisions of States, or agencies thereof, or by the Secretary under a regulatory agreement or otherwise, as to rents, charges, and methods of operation, in such form and in such manner as in the opinion of the Secretary will effectuate the purposes of this section....

12 U.S.C. § 1715(d)(3).[8] Unlike in the section 8 program, however, Congress did not

---

8. The regulations similarly provided that:
> The Commissioner may regulate and restrict the mortgagor [owner] as long as the Commissioner is the insurer, holder or reinsurer of the mortgage. Such regulation or restriction may be in the form of a regulatory agreement, corporate charter or such other means as ... [HUD] approves.
>
> 24 C.F.R. §§ 221.529, 236.1 (1973).

direct HUD to provide section 236 assistance directly to the owner by contract.

### b. Privity of Contract

■ The question of when the government may be held contractually liable for transactions undertaken pursuant to these federal housing programs was first considered by the Court of Claims and this court in the section 8 context. In *Housing Corp.*, 199 Ct.Cl. 705, 468 F.2d 922, and more recently in *National Leased Housing III*, 32 Fed.Cl. 454, private owners brought breach of contract claims against the government based upon their HAP contracts with PHAs. Relying upon the fact that HUD was not identified as a party on the HAP contracts between the owners and the PHAs, the courts found that there was no privity of contract between the owners and HUD, and therefore rejected the owners' breach claims. In so doing, both courts rejected the owners' arguments that privity between HUD and the owners on the HAP contract could be established on the ground that HUD drove the transactions at issue, that the HAP contract gave HUD certain rights and referenced agreements to which HUD was a party, or that HUD was intimately involved in the execution of the HAP contracts. *Housing Corp.*, 199 Ct.Cl. at 709, 468 F.2d at 924; *NLHA III*, 32 Fed.Cl. at 456–59.

In this claim, plaintiffs raise essentially the same arguments in an effort to overcome the fact that HUD is not identified as a party to the note upon which plaintiffs base their breach of contract claim. As in *Housing Corp.* and *National Leased Housing*, those arguments do not establish that plaintiffs were in privity with HUD on those notes and the prepayment term contained therein.

As noted above, in *Housing Corp.*, the Court of Claims considered whether HUD was in privity of contract with owners on HAP contracts executed between those owners and PHAs. Although HUD had the right to approve the contract between the PHA and the owner, and was intimately involved in aspects of its execution, the Court of Claims found that HUD was not a party to that contract. The court based this finding upon the first paragraph of the HAP contract between the PHA and the owners which

identified only the PHA and owners as the parties: "This [paragraph] makes it rather clear who the parties are and [HUD] is not one of them." 199 Ct.Cl. at 709, 468 F.2d at 924. As in these claims, the mortgage notes at issue here simply identify the parties as the owner and the lender. HUD is not so named on the notes.

This court and the Federal Circuit had occasion to revisit this question in *National Leased Housing*. In those cases, the courts considered both the claims of owners who had entered into HAP contracts directly with HUD, *NLHA I*, 22 Cl.Ct. 649 (1991); *NLHA V*, 105 F.3d 1423, and the claims of owners who had entered into HAP contracts with PHAs. *NLHA III*, 32 Fed.Cl. at 456–59; *NLHA V*, 105 F.3d at 1435–37. Relying upon *Housing Corp.*, this court rejected the claims of those owners who had entered into HAP contracts with the PHAs on the ground that HUD was not a party to the HAP contracts. *NLHA III*, 32 Fed.Cl. at 459. The fact that HUD was intimately involved in the transactions at issue, that HUD had the right to approve of the HAP contracts, or that HUD had entered directly into HAP contracts with other owners, did not sway the court on the privity issue:

> The requirement for privity of contract has an important legal basis which plaintiffs do not seem to fully appreciate. It is fundamental legal tenet that the United States as sovereign is immune from suit except where it consents to be sued and that any such waiver of sovereign immunity must be narrowly construed. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607 (1980); *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976). Where the government enters a contract directly with a party, it expresses its intent to open itself to a suit by that party in this court under the Tucker Act because such a suit would unquestionably be 'upon [an] express contract with the United States.' 28 U.S.C. 1491(a)(1).

32 Fed.Cl. at 460.

On appeal, the owners argued that language within the HAP contracts which refer-

enced the contracts between HUD and the PHA, and which gave HUD certain discretionary rights under the HAP contracts between the owners and the PHAs, could be construed to make HUD a party to the HAP contract. *NLHA V,* 105 F.3d at 1435. The Federal Circuit rejected these arguments, finding that the facts of the case did not evince "the type of direct, unavoidable contractual liability necessary to trigger a waiver of sovereign immunity, the inevitable result of finding privity of contract." *Id.* at 1436. Neither HUD's role in encouraging the transactions, nor the interrelationships among the different contractual parties, could gloss over the fact that HUD was not a party on the HAP contract.

Much like *Housing Corp.* and *National Leased Housing,* in the instant circumstance HUD encouraged the transactions, had a contractual relationship with one party to the overall transaction, and the document sued upon contained references to agreements to which HUD was a party but did not itself denote HUD as a party.[9] While plaintiffs argue that *Winstar* supports their argument that HUD was in privity with plaintiffs on the prepayment term despite the fact that HUD was not identified as a party on the note, *Winstar* supports defendant's claim that no such privity exists.

In *Winstar,* the plaintiff thrifts claimed to have secured the contract right from the government to particular accounting treatment in exchange for the thrifts' promise to acquire failing savings and loans. The instruments documenting the transaction included an explicit agreement between federal regulators and the thrifts, along with related government resolutions and letters. *Winstar V,* 518 U.S. at 861–64, 116 S.Ct. at 2448–49.

Although the term providing the thrifts with the beneficial accounting treatment was contained in resolutions to which the thrifts were not parties, this court, the Federal Circuit and the Supreme Court were persuaded that the thrifts had secured a contract right from the government to the special accounting treatment. The courts based this finding upon two facts not present in this case.

First, the courts found that the thrifts had acquired the contract right to special accounting treatment from the government because the explicit agreements between the government and the thrifts included a clause providing that the contemporaneous resolutions and letters, including the resolution containing the special accounting term, were incorporated into that agreement. *Id.* at 861–64, 116 S.Ct. at 2448–49; *Winstar IV,* 64 F.3d at 1540. Second, the courts found that the circumstances surrounding the transaction supported finding that provision of special accounting treatment was the subject of a contractual agreement between the government and the thrifts. *Winstar V,* 518 U.S. at 862–64, 116 S.Ct. at 2449; *Winstar IV,* 64 F.3d at 1542–43; *Winstar I,* 21 Cl.Ct. at 115.

Included among the circumstances the courts found indicative of that conclusion were the extensiveness of the negotiations between the thrifts and the government concerning the accounting standards, *e.g., Winstar IV,* 64 F.3d at 1536 (detailing the negotiations in the Glendale transaction), the fact that the special accounting practices at issue were neither prescribed by statute or regulations, *e.g., Winstar V,* 518 U.S. at 853–55 & n. 9, 116 S.Ct. at 2445 & n. 9 (the treatment of accounting standards was the "subject of express agreements" between the parties not

---

**9.** Notwithstanding these similarities, the court in *Cienega I* rejected the applicability of *Housing Corp.* and *National Leased Housing* on the ground that:

> [T]he putative contractual arrangements [in those cases] did not contain an express written agreement similar to the regulatory agreement into which plaintiffs and the government have entered into in this case, nor did those cases involve an express written agreement analogous to the specific agreement here at issue, *i.e.,* the rider to the deed of trust note allocating prepayment rights between HUD and the plaintiffs.

*Cienega I,* 33 Fed.Cl. at 208. While it appears that there was no agreement to which both HUD and the section 8 owners were a common party that is analogous to the regulatory agreements in this case, the HAP contracts containing the disputed term are analogous to the notes and the prepayment term at issue here. The presence of the regulatory agreement in these cases detailing the applicability of HUD regulations to individual owners, without more, is not enough to dismiss the applicability of *Housing Corp.,* and the requirement of *National Leased Housing* that privity of contract be "direct" and "unavoidable." 105 F.3d at 1435.

provided for in the governing regulations), and the fact that it would have been irrational for the thrifts to assume the risk of a regulatory change that would bring certain insolvency, *id.* at 862–64, 116 S.Ct. at 2449 ("it would have been irrational in this case for Glendale to stake its very existence upon the continuation of current policies without seeking to embody those policies in some sort of contractual commitment"); *Winstar I,* 21 Cl.Ct. at 115 (securing contract protection for the accounting practices was "critical because it was clear that without it no purchaser would have engaged in this transaction").

In this case, not only is there no provision within the regulatory agreements incorporating the note, but the circumstances surrounding the transaction do not resemble those involved in the *Winstar* litigation. Here, unlike the special accounting practices involved in that case, the prepayment term was prescribed by HUD regulations, those regulations provided that such terms were subject to amendment, and the underlying transactions between HUD and plaintiffs cannot be characterized as irrational or illogical absent a contractual agreement between HUD and plaintiffs concerning prepayment. As in the section 8 housing cases, HUD's role as embodied in the agreements by which the affordable housing properties at issue in this case were constructed and are now operated, without more, does not render HUD in privity with plaintiffs with respect to the prepayment term.

#### c. *Meaning of Prepayment Term*

█ Even were plaintiffs and HUD in privity with respect to the prepayment term, that term does not reflect the mutual promise concerning the length of the affordability restrictions plaintiffs ascribe to it. In particular, plaintiffs' claim that the term reflects their promise to maintain the affordability restrictions contained in the regulatory agreements for 20 years, and HUD's promise to lift those restrictions at the end of that period, would fail for two reasons. First, under the regulations then in effect, plaintiffs had the right to terminate those affordability restrictions at any time without HUD's consent. Second, the prepayment term and the

regulatory agreement together do not evince the government's unmistakable promise to insulate plaintiffs from a change in the law.

As noted earlier, termination of the government insurance, and thereby the affordability restrictions contained in the regulatory agreements, could occur without HUD's consent in one of two ways: prepaying the mortgage after 20 years, 24 C.F.R. § 236.30(a), or simply canceling that insurance upon mutual agreement of the owners and lenders. 24 C.F.R. § 207.253 (1973); *Johnson,* 911 F.2d at 1303. As plaintiffs had the right to terminate the government insurance, and thereby affordability restrictions, at any time without HUD's consent, it is improper to characterize the prepayment term as a promise by plaintiffs to abide by those restrictions for 20 years.

Nor may the prepayment term be read as an unmistakable promise by HUD not to regulate plaintiffs after 20 years. The unmistakability doctrine provides that "sovereign power ... will remain intact unless surrendered in unmistakable terms." *POSSE,* 477 U.S. at 52–53, 106 S.Ct. at 2397. In *POSSE,* the Supreme Court applied this principle to reject California's claim that a termination provision in its agreement with the United States enrolling the state in the federal Social Security program was a contract right entitling the state to withdraw from that program. Finding that California's claim implicated the sovereign power to "implement a comprehensive social welfare program," *id.* at 51, 106 S.Ct. at 2397, the Court framed the legal context pursuant to which California's claim would be judged:

In view of the purpose and structure of the Act, and of Congress' express reservation of authority to alter its provisions, courts should be extremely reluctant to construe § 418 Agreements in a manner that forecloses Congress' exercise of that authority. While the Federal Government, as sovereign, has the power to enter contracts that confer vested rights and the concomitant duty to honor those rights, we have declined in the context of commercial contracts to find that a 'sovereign forever waives the right to exercise one of its sovereign powers unless it expressly re-

served the right to exercise that power in' the contract. Rather, we have emphasized that '[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.'

*POSSE*, 477 U.S. at 51, 106 S.Ct. at 2397 (emphasis added) (internal citations omitted).

Considering the claim in this legal context, the Court found that the termination provision of the agreement was not a contract right entitling California to withdraw from the program. The termination provision was not such a right, according to the Court, because the clause was prescribed by the governing law, was subject to amendment under that law, and was not a term over which the individual states had any bargaining power. *Id.* at 55, 106 S.Ct. at 2398.

Plaintiffs' claim here, as in *POSSE*, implicates the sovereign power to implement and ensure the success of a social welfare program by encouraging participation in that program. Furthermore, the purported contract term at issue here, like the term at issue in *POSSE*, was prescribed by regulation, was subject to amendment, and was not a term over which the individual owners had any bargaining power. 24 C.F.R. § 236.230 (prescribing prepayment provision); 24 C.F.R. §§ 221.749, 236.249 (reserving the right to amend the prepayment regulations).[10] In view of the regulatory provision enabling plaintiffs to terminate the affordability restrictions without HUD's consent at any time, and the lack of an unmistakable promise by HUD not to regulate plaintiffs after 20 years, it cannot be said that the prepayment provision reflects a contractual

promise regarding the term of the affordability restrictions at issue in this case.

## II. Taking Claim

■ The takings clause of the Fifth Amendment to the U.S. Constitution provides "[n]or shall private property be taken for public use without just compensation." U.S. Const. amend. V. Plaintiffs assert that ELIHPA and LIHPRHA gave rise to a taking of their vested contract right to terminate the affordability restrictions after 20 years and operate their properties free of federal regulation. As it is decided that plaintiffs did not secure a contract right in this regard, plaintiffs cannot state a takings claim on this theory. *See Cavin v. United States*, 956 F.2d 1131, 1135 (Fed.Cir.1992); *Aulston v. United States*, 823 F.2d 510, 512 (Fed.Cir.1987). While plaintiffs' complaint may, however, be read to state a claim that the federal restrictions on the use of their property gave rise to taking of that property,[11] *see Penn Central*, 438 U.S. 104, 98 S.Ct. 2646, that claim is not ripe for review.

As noted earlier, under both ELIPHA and LIHPRHA, Congress provided a process by which owners could either apply to prepay their mortgages and terminate the affordability restrictions, or secure additional financial incentives to maintain the affordability restrictions. This process required an owner to file notice of intent and a plan of action with HUD proposing to terminate the affordability restrictions. HUD could approve such a plan of action if the termination of those affordability restrictions would not materially increase economic hardship for the current tenants, and there was an adequate remaining supply of affordable housing in the community. Plaintiffs do not allege that they have complied with this process and

---

10. While the court in *Cienega I* dismissed the applicability of *POSSE* on the ground that the unmistakability doctrine may not be applied to a claim seeking damages rather than injunctive relief, this distinction has since been rejected by the Supreme Court. *Yankee Atomic*, 112 F.3d at 1579 (unmistakability doctrine applicable to a contract claim seeking damages) (citing *Winstar*, 518 U.S. at 878–82, 116 S.Ct. at 2457–58).

11. While plaintiffs frame their takings claim primarily as one based on the theory that defendant has taken a discrete contract right, they may be

heard to assert a takings claim based on the theory that the defendant has effectively taken their property by restricting its use: "[P]laintiffs as private property owners, had an economically viable interest taken from them for public use by prohibiting them from exercising their vested and exclusive possessory right to deal with their properties freely and without federal control of any nature." *Greenbrier* Compl. 66; *Carrier Arms* Compl. 69, *Hobbs.* Compl. 56, *American River* Compl. 79.

received a final decision from HUD denying their request to terminate the affordability restrictions. See Malloy Decl. at ¶ 7. Rather, plaintiffs maintain that they should not be required to utilize this process because HUD would be bound to disapprove their requests under the applicable statutory standard, rendering resort to that process futile.

■ Ripeness doctrine as applied in takings cases requires that a property owner obtain a final decision from the governmental decision maker concerning the applicability of the law to the property at issue. At the threshold, this requires the property owner to make a proper application to that decision maker as required under the governing law. See Riverside Bayview Homes, 474 U.S. 121, 106 S.Ct. 455; Heck, 134 F.3d at 1470; Tabb Lakes v. United States, 10 F.3d 796, 800–01 (Fed.Cir.1993). Such application is necessary to ripen a takings claim of the kind at issue here because the assertion of regulatory jurisdiction, in and of itself, does not amount to a taking of property:

> [T]he mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking.... A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired.

Riverside Bayview Homes, 474 U.S. at 126–27, 106 S.Ct. at 459.

■ After making a proper application to the governmental decision maker, ripeness

doctrine also requires that a property owner whose proposed use has been denied utilize any variance or similar procedure by which approval could be given for a modified use, Williamson County, 473 U.S. at 191, 105 S.Ct. at 3118–19,[12] unless resort to that procedure would be futile. MacDonald, 477 U.S. at 353 n. 9, 106 S.Ct. at 2568 n. 9.

■ Plaintiffs maintain that the futility exception of MacDonald excuses them from so much as applying to HUD to terminate the affordability restrictions on the ground that HUD would surely deny their request given the stringent statutory standards by which that request would be judged. While the futility exception of MacDonald may be applied to relieve a property owner of the necessity of seeking a variance or other similar relief after a first application for a particular use has been denied, it is not properly applied to a case where, as here, the property owner has not yet applied to engage in the proposed use. See Riverside Bayview Homes, 474 U.S. at 126–27, 106 S.Ct. at 458–59. Furthermore, even if it were proper to apply the futility exception on these facts, rigorous statutory criteria, without more, would not be enough to trigger that exception. Heck, 37 Fed.Cl. at 252 ("[E]ven if plaintiff showed an objective probability of denial on the merits ... the application process could not thereby be characterized as 'futile'.... A plaintiff cannot plead futility whenever faced with long odds or demanding procedural requirements."), aff'd, 134 F.3d 1468.

Plaintiffs' argument that their claim is analogous to that presented in Suitum, 520 U.S. 725, 117 S.Ct. 1659, is without merit. In

---

12. E.g., Southview Assoc., Ltd. v. Bongartz, 980 F.2d 84, 98 (2d Cir.1992) (takings claim unripe where denial of permit application did not preclude submission of modified application); Executive 100, Inc. v. Martin County, 922 F.2d 1536, 1541 (11th Cir.1991) (takings claim unripe where property owner failed to pursue less intensive development scheme after initial denial); cert. denied, 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991); Villas of Lake Jackson, Ltd. v. Leon County, 796 F.Supp. 1477, 1480 (N.D.Fla.1992) (denial of multifamily development did not present ripe takings claim where no application made for single family development permitted by zoning scheme); Killington, Ltd. v. Vermont, 164

Vt. 253, 668 A.2d 1278, 1283 (1995) (takings claim unripe where permit denial contained mitigation measures that would satisfy endangered species concerns and allow for development); Martin County v. Section 28 Partnership, Ltd., 676 So.2d 532, 537 (4th D.C.A. Fla.1996) (alternative uses must be applied for and conclusively denied by regulatory body before takings claim will be ripe), cert. denied, —— U.S. ——, 117 S.Ct. 1553, 137 L.Ed.2d 701 (1997); Tinnerman v. Palm Beach County, 641 So.2d 523, 525 (4th D.C.A. Fla.1994) (futility not established until property owner has submitted one meaningful application for modification, variance, or less intensive use).

*Suitum,* the regional land use scheme at issue proscribed the development of the plaintiff's property, but provided the plaintiff with valuable transferrable development rights (TDRs) which she could sell to landowners in areas where development was permissible. *Id.* at ——-——, 117 S.Ct. at 1663–64. While the precise number of TDRs to which the plaintiff was entitled were known and could be appraised, the Ninth Circuit found the claim unripe because the plaintiff had not actually attempted to sell those rights. *Suitum v. Tahoe Regional Planning Agency,* 80 F.3d 359, 362–63 (9th Cir.1996). The Supreme Court reversed, finding the claim ripe on the ground that the regional land use authority had rendered its final decision concerning how the law applied to the plaintiff's property. *Suitum,* 520 U.S. at ——-——, 117 S.Ct. at 1667–68. The pivotal factor underlying the Court's finality determination was the fact that the statutory scheme at issue did not give the regional land use authority the discretion to modify the development prohibition or afford the plaintiff additional TDRs.

By contrast with *Suitum,* in this case HUD had the discretion under ELIHPA and LIHPRHA to approve plaintiffs' prepayment plans, terminate or modify the affordability restrictions, or grant plaintiffs additional financial incentives to retain those restrictions. Accordingly, *Suitum* lends plaintiffs no support.

### CONCLUSION

As it is decided that there was no contractual agreement between plaintiffs and defendant by which plaintiffs promised to maintain the affordability restrictions applicable to their properties for 20 years in exchange for the government's promise to lift those restrictions at the end of that time period, it is **ORDERED** that plaintiff's motion for summary judgment on their breach of contract claim is **DENIED,** and defendant's motion on that claim is **GRANTED.**

Further, because plaintiffs did not apply to HUD as provided in ELIHPA and LIHPRHA in order to determine whether and to what extent the affordability restrictions at issue in this case would be required to be retained under those statutes, plaintiffs' takings claim is not ripe for review. Consequently, it is further **ORDERED** that defendant's motion for summary judgment on plaintiffs' takings claim is **GRANTED.**

Accordingly, it is **ORDERED** that final judgment shall be entered dismissing the complaint as to all named plaintiffs with no costs to be assigned.