GREENBRIER, Woodlake Village Partnership, Carrier Arms Apartments, Ltd., Colonial Terrace Apartments Ltd., First Brookwood, Ltd., First Buena Vida, Ltd., First Fairmont II, Ltd., First Plaza Dorado Limited Partnership, First Village West Limited Partnership, First Plaza Hills East Limited Partnership, High House Village Apartments, Ltd., Hillcrest Apartments, Ltd., Jackson Manor Apartments, Ltd., Skyline Fox Hollow Joint Venture, South Park Apartments, Ltd., Southside Village Apartments, Ltd., First Parkwood Limited Partnership, American River Limited Partnership, Aspen Manor, Bear Mountain Village, Camelot North Company, Camelot South Company, Canyon Apartments Company, Cascade Terrace Limited Partnership, Cottonwood Manor Company, Ellendale Arms Apartments, Escondido Park Apartments, Foothill Gardens Limited Partnership, Hollister Plaza Limited, Imperial Villa Apartments, La Verne Terrace Limited Partnership, Laurel Canyon Terrace, Meyler Park Apartments, Miller Avenue Apartments, Napa Park Ltd., Ontario Townhouses, Palmdalia Limited Partnership, Queen Ann Investment Company, Rose Gardens Housing Limited, Santa Clara Terrace Company, Tempe Apartments, A Limited Partnership,

---

**7.** Appellant's motion for attorney's fees is denied.

Tempe Garden I, C.A. Hobbs, Jr., Lauryce G. Hobbs, Charles L. Adrian, Southbrook Garden Apartments, Ltd., Sugar Grove Square Ltd., Hugh V. Smith Enterprises, Inc. and First Fairmont Terrace, Ltd., Plaintiffs–Appellants,

v.

UNITED STATES, Defendant–Appellee

No. 98–5111.

United States Court of Appeals, Federal Circuit.

Oct. 4, 1999.

Rehearing Denied; Suggestion for Rehearing En Banc Declined Dec. 27, 1999.

H. Stephen Harris, Jr., Alston & Bird, LLP, Atlanta, Georgia, argued, for plaintiffs-appellants. On the brief was R. Carter Sanders, Alston & Bird, LLP, Washington, DC.

Brian M. Simkin, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued, for defendant-appellee. With him on the brief was David M. Cohen.

Before MAYER, Chief Judge, LOURIE, and RADER, Circuit Judges.

Opinion of the court filed by Circuit Judge LOURIE. Concurring opinion filed by Circuit Judge RADER.

LOURIE, Circuit Judge.

Greenbrier et al. (the "Owners") appeal from the decisions of the United States Court of Federal Claims denying them class certification, *see Greenbrier (Lake County Trust Co. No. 1391) v. United States*, No. 96–326C (Mar. 7, 1997) and granting summary judgment in favor of the United States on the Owners' breach of contract and takings claims, *see Greenbrier (Lake County Trust Co. No. 1391) v. United States*, 40 Fed. Cl. 689 (Fed.Cl. 1998). Because the trial court correctly determined that the United States was not in privity of contract with the Owners and therefore could not be held liable for breach of such contracts, and correctly determined that the Owners' takings claim is not ripe for review, we affirm its grant of summary judgment against the Owners and its dismissal of their complaint. In light of these holdings, the petition for class certification is moot.

## BACKGROUND

Greenbrier et al. are 249 low-income housing Owners who allege that they each secured the contractual right from the United States to prepay without its approval their government-insured mortgage loans after 20 years and that Congress's enactment of the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA")[1] and the Low–Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA"),[2] both of which required that the Owners obtain permission from HUD before prepaying their mortgage loans, breached their contracts. The Owners alternatively argue that such statutory enactments gave rise to a taking of their properties, entitling them to just compensation. The Owners also seek to be certified as a class.

The breach of contract claim asserted by the Owners in this case is identical to that asserted by the low-income housing owners in *Cienega Gardens v. United States*, 162 F.3d 1123 (Fed.Cir.1998). The only difference between this case and *Cienega Gardens* is that this case also presents takings and class certification issues. Because the background facts relating to the issues in this case are indistinguishable from those involved in *Cienega Gardens*, only a simplified description of the parties' agreements and the regulatory scheme is set forth herein, a more exhaustive description being set forth in that opinion.

In the 1960s and 1970s, pursuant to two National Housing Act programs referred to as "Section 221(d)(3)"[3] and "Section 236,"[4] the Owners entered into agree-

1. Pub.L. No. 100–242, Title II, 101 Stat. 1877 (1987) (pertinent parts reprinted in 12 U.S.C. § 1715l note (1989) (Preservation of Low Income Housing)).

2. Pub.L. No. 101–625, Title VI, § 601(a), 104 Stat. 4249 (1990) (codified at 12 U.S.C. §§ 4101–47).

3. *See* 12 U.S.C. § 1715l (d)(3) (1994).

4. *See id.* § 1715z–1 (1994).

ments with the Department of Housing and Urban Development ("HUD") and private lending institutions for the purpose of financing the construction of low– and moderate-income public housing projects. In return for submitting to certain HUD regulation of their housing projects, the Owners each benefited from mortgage insurance and low-interest mortgage loans.[5] At issue in this case is whether the Owners contracted with the United States for particular mortgage loan prepayment rights and whether Congress's enactment of EL-IHPA and LIHPRHA, which restricted mortgage loan prepayments, breached such contractual rights. Also at issue is whether the Owners' claim that these statutes effected a taking of their properties is ripe for review and whether the trial court abused its discretion by denying them class certification.

Each of the Owners executed substantially similar sets of contracts with the United States and the lenders. First, a lender and an Owner submitted to HUD an application for insurance of a mortgage loan for a property on which a low– or moderate-income housing project would be constructed. The application had to comply with certain eligibility requirements, terms, and conditions prescribed by HUD. *See* 12 U.S.C. §§ 1715l(b), 1715z–1(j) (1994). The Federal Housing Commissioner, acting on behalf of the Secretary of HUD, thereafter gave the lender and Owner a "Commitment for Insurance of Advances" wherein it promised to endorse for insurance a 40–year mortgage note in a specified amount, "subject to compliance with the requirements of the Regulations,

the terms and conditions set forth below, and the attached specified conditions, if any." The commitment specified certain mortgage loan payment terms and stated that certain documents relating to the construction project and its financing, including the mortgage and note, were to be submitted to HUD for approval. The commitment did not specify any prepayment terms, but it did state that "[a]ll forms, certificates, documents and agreements called for by this commitment shall be upon forms approved or prescribed by the Commissioner and shall be completed, executed and filed ... in such manner as he shall prescribe."

After receiving commitments for insurance, the Owners and lenders executed substantially similar 40–year mortgage notes and mortgages on the subject properties. Although some Owners executed notes that did not permit prepayment at any time without the Commissioner's consent, the notes (or riders thereto) generally allowed prepayments without prior HUD approval "after 20 years from the date of final endorsement of this note by the Federal Housing Commissioner," provided the Owner was a "limited distribution entity."[6] HUD did not sign the notes. The mortgages each incorporated by reference the mortgage note and a Regulatory Agreement (*see infra*) between HUD and the Owner, and provided that upon the Owner's default, under the Regulatory Agreement and upon the Federal Housing Commissioner's request, the lender had the option to declare the whole of the indebtedness due and payable.

---

**5.** An Owner participating in the Section 221(d)(3) program paid below-market interest rates on its mortgage loan. *See id.* § 1715l (d)(5) (1994). Under the Section 236 program, the United States made interest reduction payments to a lender, on behalf of an Owner, which resulted in the Owner paying as little as 1% interest on its mortgage loan. *See* 12 U.S.C. § 1715z–1(c) (1994).

**6.** The prepayment terms reflected contemporaneous HUD regulations governing the two programs. The regulations then in effect provided that the mortgage insurance contract

(and thus HUD's regulation) could be terminated either by prepayment in full of the mortgage loan or by a joint request from the lender and owner evidencing a "voluntary agreement" to terminate the mortgage insurance. *See* 24 C.F.R. §§ 207.253, 221.524(a)(ii), 236.30(a)(I) (1973). The regulations also stated that they were subject to amendment at any time, with the proviso that such amendments would not adversely affect the interests of a *lender* (but not an owner) under a preexisting insurance contract. *See id.* §§ 221.749, 236.249 (1973).

On or about the same dates as the notes and mortgages were signed, the Owners and HUD also executed virtually identical Regulatory Agreements that set in place low-income affordability restrictions · for the subject properties. These agreements each stated that, in consideration of the Commissioner's endorsement of the note for insurance, the Owner agreed to comply with applicable statutes and regulations and to follow various rules concerning the operation and management of the project for as long as the contract of mortgage insurance was in effect. These rules included restrictions on the rate of return that an Owner could receive from the project and restrictions on the rental rates it could charge the tenants. The Regulatory Agreements did not contain any provisions regarding prepayment of the mortgage notes. HUD thereafter endorsed each note to indicate its insurance commitment to the lender and entered into a separate mortgage insurance agreement with that lender.

The agreements can thus be summarized as follows: Each Owner agreed with HUD to submit to its regulation for as long as HUD insured the Owner's 40–year note. In return for the lender's financing, the Owner promised the lender not to prepay its mortgage loan for at least 20 years without HUD's approval, and also agreed to comply with the Regulatory Agreement that it had entered into with HUD. Each of the Owners thereby bound itself to HUD's regulation (and therefore limited investment returns) for the duration of the loan.

In 1987, Congress became concerned that a large number of housing project Owners would prepay their mortgage loans, leave the housing programs to earn more money from their properties, and thereby reduce the supply of low-income rental housing. It therefore enacted ELIHPA, which placed a two-year moratorium on unconditional, unilateral prepayments of HUD-insured mortgage loans and required that an Owner obtain HUD approval before *any* prepayment, even after 20 years.[7] ELIHPA also authorized HUD to provide financial incentives to applicants who agreed to remain in the program.[8] When ELIHPA was enacted, some of the Owners were already entitled to prepay their mortgage loans under the terms of their notes because 20 years had passed since HUD endorsed the notes. Other Owners were not yet entitled to prepay their loans.

In 1990, Congress replaced ELIHPA with LIHPRHA, which continued ELIHPA's prepayment regulations and authorized HUD to grant the Owners numerous financial incentives in order to encourage them not to prepay their mortgage loans and to remain in the programs. *See* 12 U.S.C. § 4101–47. Thus, the Owners could not prepay their mortgage loans after 20 years without HUD approval, even though their notes permitted such prepayments. As a consequence of ELIHPA and LIHPRHA, the Owners had to overcome ·yet another hurdle in order to leave the federal housing program, convert their properties into conventional rental or other properties, and earn higher returns on their investments.

In 1996, Congress enacted the Housing Opportunity Program Extension Act of 1996 ("HOPE").[9] Among other things, HOPE authorized low-income housing owners to prepay their mortgage loans without HUD's prior approval. That hurdle has thus now been removed.

None of the 249 Owners in this case ever sought permission to prepay their mortgage loans during the period when

---

7. *See* Pub.L. No. 101–242, § 221, 101 Stat. 1878–79. HUD's approval was conditioned on it making certain written findings regarding the prepayment's effect on existing tenants and the availability of low-income housing in the local area. *See id.*, § 225, 101 Stat. 1880.

8. *See id.* § 224, 101 Stat. 1880–01.

9. Pub.L. No. 104–120, § 2, 110 Stat. 834 (Mar. 28, 1996).

HUD's prior approval was required under ELIHPA and LIHPRHA (1988–1996). Many of them did apply to extend the affordability restrictions or to transfer their projects to qualified purchasers. *See Greenbrier,* Nos. 96–326C, –364C, –435C, and –697C, Declaration of Joseph Malloy at 4–6, attachment A (May 3, 1997). Since HOPE's enactment, a small number of the Owners have prepaid their notes; the vast majority have not, even though they are presently free to do so without HUD's approval.[10]

Greenbrier filed suit against the United States in the Court of Federal Claims shortly after HOPE's enactment in 1996. The case was consolidated with three others[11] and additional plaintiffs were also joined, making a total of 249 separate plaintiffs. Greenbrier also filed a motion for class certification. The court denied the motion, reasoning that "factual differences among individual Plaintiffs' claims may well serve to distinguish the putative contractually bargained-for-rights at issue here" and that the "determination of Plaintiffs' takings claims will require inquiry into the factual nuances of each individual case." *Greenbrier,* slip op. at 1–2.

The trial court subsequently granted summary judgment in favor of the United States on both the breach of contract and the takings claims and dismissed the Owners' complaint. *See Greenbrier,* 40 Fed. Cl. at 689. The court held that the United States could not be liable for breach of contract because neither the documents nor the context of the transactions indicated that HUD and the Owners were in privity of contract with respect to the prepayment terms found in the mortgage notes. *See id.* at 691, 700. The court also held that since the Owners did not secure such a contractual right from HUD, they could not state a takings claim premised on the theory that the government took such a right. *See id.* at 692, 701. The

court stated that inasmuch as the Owners claimed that the government's enactment of legislation imposing restrictions on the use of their property gave rise to takings, their claim was not ripe for review. It reasoned that the legislation provided procedures for the Owners to apply to have the restrictions removed or modified, that none of the Owners claimed that they made such applications, and that a final decision by the government on such an application was necessary. *See id.* at 701–02.

The Owners timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (1994).

## DISCUSSION

### A. Breach of Contract Claim

■ In *Cienega Gardens* we outlined our standard of review with respect to the breach of contract claim:

Under the Tucker Act, the Court of Federal Claims has jurisdiction over claims based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (1994). We have stated that "[t]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government. . . ." In other words, there must be privity of contract between the plaintiff and the United States. The effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity. Whether a contract exists is a mixed question of law and fact. Since the parties do not dispute the relevant facts, the privity issue reduces to a question of law, which we review *de novo.* Contract interpretation itself also is a question of law, which we review de novo.

*Cienega Gardens,* 162 F.3d at 1129–30 (internal citations omitted).

---

**10.** As of May 3, 1997, only 30 of the 249 Owners prepaid their mortgage loans and left the program under HOPE. *See* Declaration of Joseph Malloy at 6, attachment A.

**11.** *See Carrier Arms Apartments v. United States,* No. 96–364C (Fed.Cl.); *C.A. Hobbs v. United States,* No. 96–435C (Fed.Cl.); *American River Ltd. Partnership v. United States,* No. 96–697C (Fed.Cl.).

■ This court decided *Cienega Gardens* while the present appeal was pending. That case involved another group of low-income-housing owners who entered into the same National Housing Act programs and executed the same series of contracts with HUD and private lenders as the Owners in this case. The *Cienega Gardens* owners also claimed that they had secured a contractual right from HUD to prepay their mortgage loans after 20 years without HUD approval and that the United States breached such contracts by restricting such prepayments under ELIHPA and LIHPRHA.

In *Cienega Gardens* we held that the United States and the owners were not in privity of contract with respect to the notes' prepayment terms because (1) the Regulatory Agreements contained no provisions relating to prepayment and did not incorporate any such provision by reference; (2) HUD's endorsements for insurance of the mortgage notes did not make it a party to the prepayment terms contained in the notes or the riders thereto; and (3) the incorporation by reference of the notes and the Regulatory Agreements into the mortgages did not make HUD a party to those mortgages. *See Cienega Gardens*, 162 F.3d at 1132–33. After determining that the documents unambiguously evidenced separate agreements between distinct parties, we concluded that "the contract documents simply do not show privity of contract between the owners and HUD with respect to a right to prepay the mortgage loans after twenty years without HUD approval." *Id.* at 1133. We noted that the applicable regulations, which mirrored the prepayment terms found in the notes, further supported the conclusion that there was no privity of contract because they expressly stated that they were subject to amendment:

[I]t would have been inconsistent for HUD to have entered into the Regulatory Agreement if the agreement fixed the prepayment rights of the Owners, in view of the express power to amend the … regulations at any time that was reserved to HUD, subject only to the caveat that [*lenders'*] interests not be adversely affected.

*Id.* at 1134 (emphasis added). Lastly, we stated that the fact that HUD was intimately involved in the contracts between the private lending institutions and the owners did not create a contractual relationship with respect to the prepayment rights. *See id.* Because we found no privity of contract, we held that the United States could not be liable to the owners for breach of contract by enacting ELIHPA and LIHPRHA. *See id.* at 1136.

Our holding in *Cienega Gardens* is dispositive of the issue concerning whether the Owners in this case were in privity of contract with the government with respect to the prepayment terms found in their mortgage notes. The facts in this case are indistinguishable. Each of the Owners here executed the same series of contracts with HUD and a lender, under the same National Housing Act programs, as the owners in that case. There are no material differences between the terms of the notes, Regulatory Agreements, and mortgages to which the Owners in this case were a party and the terms of the documents to which the *Cienega Gardens* owners were a party. Since we are bound by the *Cienega Gardens* holding, we affirm the trial court's determination that the United States was not in privity of contract with the Owners with respect to the prepayment terms found in their mortgage notes and it is therefore not liable for breach of such contracts.[12]

---

12. During oral argument, the Owners referred to a recently-filed brief by the United States in an unrelated case involving other low-income housing owners who entered similar National Housing Act programs and who entered into contracts with lenders and HUD similar to those in this case. The Owners argue that in that brief, the government admits to being in privity of contract with the Owners with regard to the mortgage notes' prepayment terms. We do not discern such an explicit admission in the brief. Moreover, this late-filed submission does not change the

## B. Takings Claim

██ The Owners also appeal the trial court's dismissal of their takings claim on ripeness grounds. We review the question of ripeness *de novo.* *See Howard W. Heck & Assocs., Inc. v. United States,* 134 F.3d 1468 (Fed.Cir.1998).

██ The Owners argue that their "unfettered rights to prepay their mortgages" were "vested property rights," that by enacting ELIHPA and LIHPRHA Congress made a final decision to take such "unfettered rights," and that their takings claim was therefore ripe for adjudication. The Owners argue that it is irrelevant that the statutes provided procedures for obtaining permission to prepay their mortgage loans because "[s]ubjecting appellants to such an administrative process itself deprives the Owners of their unfettered option to exit the regulatory program. There is no requirement that administrative remedies be exhausted...." The Owners cite *Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997), to support their argument that the takings issue was ripe. The Owners state that they do not challenge the validity of the statutes and only argue that the statutes deprived them of property rights. We thus only consider whether their claim that the legislation deprived them of their property is ripe for adjudication when they never sought HUD's approval to prepay their mortgage loans or were denied the right to do so.

The government responds that the Owners' takings claim is not ripe until HUD issues a final decision denying them prepayment, because ELIHPA and LIHPRHA did not prohibit mortgage loan prepayments altogether, but rather required Owners to apply to HUD for permission to prepay. The government argues that the Owners have not even alleged that they

sought such permission, let alone that they were denied it.

As a preliminary matter, we understand the Owners to argue that they have suffered regulatory rather than physical takings, since they do not allege that the government physically occupied or destroyed their properties,[13] but rather that the prepayment rights in their mortgage notes were "vested property rights" that were "taken" by the legislation.

██ The Fifth Amendment provides in relevant part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V, cl. 4. Although the Supreme Court has stated that "[c]ontract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid," *United States Trust Co. of N.Y. v. N.J.,* 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), it has also emphasized that a government's interference with contractual rights does not necessarily constitute a taking of their property:

> Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them. If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions. For the same reason, the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking. This is not to say that contractual rights are never property rights or that the Government may al-

---

fact that we are bound by the holding in *Cienega Gardens.*

**13.** "The government effects a physical taking only where it requires the landowner to sub-

mit to the physical occupation of his land." *Yee v. City of Escondido, Cal.,* 503 U.S. 519, 527, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992).

ways take them for their own benefit without compensation.

*Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 223–24, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (internal quotation marks and citations omitted); *see also Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). For purposes of this appeal we thus accept, but do not decide, that the prepayment terms in the Owners' notes may constitute "property." Even if the Owners' mortgage note prepayment terms are property rights and were affected by the government's actions, a taking need not have occurred.

■■■ "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). In order to successfully assert a regulatory takings claim, the Owners must establish two components: that the regulation has in substance "taken" their property by going "too far," and that any proffered compensation is not "just." *See MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986); *Suitum,* 520 U.S. at 734, 117 S.Ct. 1659. Governmental regulation does not effect a taking if it "substantially advance[s] legitimate state interests" and does not "den[y] an owner economically viable use of his property." *Dolan v. City of Tigard,* 512 U.S. 374, 385, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (quoting *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)). A regulation goes "too far" for purposes of the Fifth Amendment when it denies all economically beneficial or productive use of land. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015–16, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). However, "a court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *MacDonald,* 477 U.S. at 348, 106 S.Ct. 2561; *Suitum,* 520 U.S. at 734, 117 S.Ct. 1659. "[T]his is a question of degree—and therefore cannot be disposed of

by general propositions." *MacDonald,* 477 U.S. at 348, 106 S.Ct. 2561 (citing *Pennsylvania Coal,* 260 U.S. at 416, 43 S.Ct. at 160). The Supreme Court has not provided any "set formula to determine where regulation ends and taking begins," but rather requires "essentially ad hoc, factual inquiries" as to the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the governmental action. *See id.* at 348–49, 106 S.Ct. 2561.

■■■ The Supreme Court "ha[s] ma[d]e it quite clear that the mere assertion of regulatory jurisdiction does not constitute a regulatory taking." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 126, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).

> The reasons are obvious. A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the [property owner] free to use the property as desired.

*Id.* at 126–27, 106 S.Ct. 455. *See also Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 296–97, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). In *Hodel* the Court had earlier stated that the Surface Mining Act did not "categorically prohibit surface coal mining, it merely regulate[d] the conditions under which such operations may be conducted." It noted that "[t]here is no reason to suppose that 'mere enactment' of the Surface Mining Act has deprived appellees of economically viable use of their property." *Hodel,* 452 U.S. at 296–97, 101 S.Ct. 2352. The Supreme Court subsequently held in *Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988), that a property owner's facial challenge to a city rent control ordinance provision requiring a hearing officer to take into account the "hardship to a tenant" was not ripe for

review because the property owner had not alleged that the provision had ever been applied. *See id.* at 9–10, 108 S.Ct. 849. Thus, the law is clear that a statute, regulation, or ordinance that provides for a government entity to make a discretionary decision as to the conditions of use of property cannot be found to have taken property upon enactment or promulgation of the statute, regulation, or ordinance. Enforcement is required before one can determine the extent of any deprivation of the property. In contrast, when a statute affecting private property lacks any licensing or other administrative provisions permitting an agency to vary its regulatory activities under the statute, a takings claim may be ripe upon enactment of the statute. *See Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987).

Before we can determine whether the Owners' takings claim in this case is ripe, we thus must examine the particular provisions of the statutes we are faced with in order to determine whether or not they necessarily foreclose economically viable use by the Owners or whether they provide for a discretionary decision permitting such use. The most relevant provisions in the statutes before us read as follows:

§ 221. General prepayment limitation.

(a) Prior approval of plan of action.—An owner of eligible low income housing may prepay, and a mortgagee may accept prepayment of, a mortgage on such housing only in accordance with a plan of action approved by the Secretary of Housing and Urban Development under this subtitle.

12 U.S.C. § 1715*l* note (1994) (ELIHPA).

§ 4101(a) Prepayment and termination

An owner of eligible low-income housing may prepay, and a mortgagee may accept prepayment of, a mortgage on such housing only in accordance with a plan of action approved by the Secretary under this subchapter or in accordance with section 4114 of this title. An insurance contract with respect to eligible low-income housing may be terminated pursuant to section 1715t of this title only in accordance with a plan of action approved by the Secretary under this subchapter or in accordance with section 4114 of this title.

12 U.S.C. § 4101(a) (Supp.1997) (LIHPRHA). Examination of these statutes shows that neither statute denies an owner the ability to prepay its mortgage loan; rather, both statutes provide that an owner may prepay, albeit only in accordance with a plan of action approved by the Secretary. The clear implication is, therefore, that permission to prepay may be granted. ELIHPA and LIHPRHA both outline procedures and criteria for HUD to use in order to determine whether prepayment should be allowed. *See id.* §§ 1715*l* note, 4107–47; 24 C.F.R. §§ 248.101–248.183. HUD is expressly granted the authority to approve prepayment proposals. *See* 12 U.S.C. §§ 4108, 4114. In fact, HUD has approved prepayment proposals on three of the eight occasions on which such approval was sought. ELIHPA and LIHPRHA thus set up a scheme for regulating how and when mortgage notes may be prepaid. As such, both ELIHPA and LIHPRHA "merely assert regulatory jurisdiction" over the Owners' ability to prepay their mortgage loans. Their enactment cannot therefore constitute a taking of any property rights.

■ We next must consider whether the Owners' claim that the statutes, as applied, took their property rights is ripe for adjudication. The Supreme Court has stated that for an "as applied" takings challenge to become ripe, the government entity charged with implementing the statute, regulation, or ordinance at issue must have reached a "final decision" regarding its application to the property at issue. *See Suitum,* 520 U.S. at 734, 117 S.Ct. 1659; *MacDonald,* 477 U.S. at 348–49, 106 S.Ct. 2561; *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). This rule is "compelled by the very nature of the inqui-

ry required by the Just Compensation Clause" because the factors applied in deciding a takings claim "simply cannot be evaluated until the administrative agency has arrived at a final definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson,* 473 U.S. at 190–91, 105 S.Ct. 3108; *see also MacDonald,* 477 U.S. at 350, 106 S.Ct. 2561 ("Whether the inquiry asks if a regulation has 'gone too far,' or whether it seeks to determine if proffered compensation is 'just,' no answer is possible until a court knows what use, if any, may be made of the affected property.").

■ This means that where a government entity provides procedures for obtaining such a final decision, a takings claim will not be ripe until the property Owner complies with those procedures.[14] *See Williamson County,* 473 U.S. at 186–88, 105 S.Ct. 3108 (holding "as applied" takings claim not ripe where the property owner never sought variances from the zoning ordinance); *Hodel,* 452 U.S. at 297, 101 S.Ct. 2352 (same); *Agins,* 447 U.S. at 260, 100 S.Ct. 2138 (holding property owner's challenge to application of zoning ordinance not ripe where it did not submit a development plan). The failure to follow all applicable administrative procedures can only be excused in the limited circumstance in which the administrative entity has no discretion regarding the regulation's applicability and its only option is enforcement. *See Suitum,* 520 U.S. at 738–40, 117 S.Ct. 1659. The reason for this exception is that in such circumstances, no uncertainty remains regarding the impact of the regulation, *see id.* at 740, 117 S.Ct. 1659, certainty being the basis for the ripeness requirement, *see, e.g.,*

*MacDonald,* 477 U.S. at 348, 106 S.Ct. 2561 ("It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property.").

None of the Owners in this case have alleged that they followed the procedures provided for obtaining HUD permission to prepay their mortgage loans, much less that they have received final decisions from HUD denying them such permission.[15] The enactment of the statutes did not constitute such final decisions. That HUD may have set a high hurdle by imposing stringent requirements for granting such permission does not excuse the Owners' failure to seek such permission. Moreover, the hurdle does not appear to be as high as the Owners would have us believe. While they argue that such applications would be futile, it is undisputed, as we noted earlier, that HUD granted permission for the prepayment of the mortgage loans in three of the eight instances where such permission was sought.

The Owners cite *Suitum* to support their argument that their takings claim is ripe. *Suitum* does not help the Owners, however. In that case, as the Supreme Court pointed out, there was no question about how the regulations at issue applied to the land in question. *See Suitum,* 520 U.S. at 739, 117 S.Ct. 1659. Moreover, the Court stated that the agency had no discretion to exercise over Suitum's right to use her land. *See id.* at 739–40, 117 S.Ct. 1659. The facts of this case are quite different.

**14.** Since a taking is unconstitutional only when the government entity takes property and does not provide just compensation, the property owner must also utilize any prescribed procedures for obtaining compensation. *See Williamson County,* 473 U.S. at 186, 194, 105 S.Ct. 3108. The Tucker Act, 28 U.S.C. § 1491, provides a forum for bringing taking claims against the United States. *See id.* at 195, 105 S.Ct. 3108.

**15.** In their brief, the Owners claim that "the court ignored record evidence indicating that some of the Owners had, in fact, applied for permission to prepay." However, they do not assert that they applied for permission to prepay under ELIHPA or LIHPRHA, and they have not pointed to any record evidence substantiating such an assertion. The evidence before us only indicates that some of the Owners have prepaid their mortgage loans under HOPE's provisions.

The trial court thus correctly held that the Owners' takings claim is not ripe for review; we therefore affirm its grant of summary judgment against the Owners and its dismissal of their complaint.

### C. Class Certification

■ The Owners lastly appeal the trial court's order denying the certification of a class defined as all persons and entities who are entitled to exercise contractually bargained-for rights to prepay their HUD-insured mortgage loans, excepting those similarly situated owners with cases currently pending. This issue is moot in light of our holdings that the government is not liable to the Owners for breach of contract and that their takings claim is not ripe for review. We therefore need not consider the correctness of that order.

### CONCLUSION

The trial court correctly determined that the United States was not in privity of contract with the Owners and therefore could not be held liable for breach of such contracts; we therefore affirm its grant of summary judgment against the Owners on its breach of contract claim. The trial court also correctly determined that the Owners' takings claim is not ripe for review; we affirm its grant of summary judgment against the Owners and its dismissal of their complaint. In light of our holdings that the government is not liable to the Owners for breach of contract and that their takings claim is not ripe for review, the petition for class certification is moot.

*AFFIRMED.*

RADER, Circuit Judge, concurring.

Relying on *Cienega Gardens v. United States*, 162 F.3d 1123 (Fed.Cir.1998), this court determines that the United States was not in privity of contract with the low-income housing owners. As in *Cienega Gardens*, this court detects no privity because the prepayment rights, which Congress unilaterally withdrew, appeared in mortgage agreements but not in regulatory agreements with the United States.

During the present case, this court learned that the United States had argued before the United States District Court for the Eastern District of Pennsylvania that the regulatory agreements with the owners and the mortgage notes were a single transaction. *See* United States' Memorandum in Opposition to the Defendants' Motion for Summary Judgment, *United States v. David*, No. 94–7191, 1995 WL 57502 (E.D.Pa.1995). In my judgment, this revelation undermines this court's reliance on *Cienega Gardens*, which itself looks suspect in the context of the arguments the United States made in the Pennsylvania District Court.

In *David*, the United States claims that the defendant property owner violated the NHA regulations and the regulatory agreement between HUD and the owner by withdrawing funds from HUD-insured projects. In response to defendant's motion for summary judgment, the United States reveals its position on the NHA mortgage documents:

> "All writings forming part of the same transaction must be construed together." United States' Memorandum at 7, *David* (No. 94–7191).

> "The mortgage instruments support the United States' construction of the language of the regulatory agreements.... The rules of construction require the two documents be examined together to ascertain the parties' objective intent." *Id.* at 13–14.

> "The regulatory agreement is the *quid pro quo* for HUD's endorsement of the note for insurance." *Id.* at 15.

> "The regulatory agreement viewed in the context of its role in the mortgage insurance program, and the requirement that mortgages be regulated as evidenced by the regulations, must be construed to endure as long as HUD insures, coinsures, owns or holds, the mortgage." *Id.* at 16.

These statements in *David* cast a very different light on the United States' arguments that HUD did not intend to be

bound by the terms of the mortgage agreements. Because *Cienega Gardens* governs in later cases on the same issue, I must concur in the judgment of this court unless revisited *en banc*.