**BAY VIEW, INC., an Alaska Native Village Corporation, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–456L.

United States Court of Federal Claims.

April 19, 2000.

Samuel J. Fortier, Anchorage, AK, for plaintiff.

Ruth Ann Storey, Washington, D.C., with whom was Assistant Attorney General Lois J. Schiffer, for defendant.

### Opinion and Order

WEINSTEIN, Judge.

This case is before the court on defendant's motion to dismiss pursuant to Rule 12(b) of the Rules of the United States Court of Federal Claims (RCFC). Plaintiff alleges[1] that Congress' 1995 amendment of section 1606(i) of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §§ 1601–1629(f) (1994 & Supp. III 1997)[2] constitutes a taking of plaintiff's property (Count I); a breach of trust (Count II); and a breach of contract (Count III).[3] The court dismisses Count II for lack of subject matter jurisdiction, see RCFC 12(b)(1), and Counts I and III for failure to state a claim upon which relief can be granted. See RCFC 12(b)(4).

### FACTS

ANCSA was enacted into law on December 18, 1971. See Pub.L. No. 92–203, 85 Stat. 688. ANCSA completely extinguished all aboriginal title claims to Alaska land, see § 1603(b),(c), and transferred to state-chartered private for-profit corporations to be formed by Alaska natives (Native Corporations) $962.5 million in state and federal funds and approximately 44 million acres of Alaska land. *Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520, 524, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998). Congress required all shareholders in the Native Corporations to be Alaska natives. *Id.*

ANCSA created two types of Native Corporations: "Regional Corporations" and "Village Corporations." Twelve Regional Corporations were formed pursuant to section 1606. Approximately 200 Village Corporations were formed pursuant to section 1607. Plaintiff Bay View, Inc. is a Village Corporation.

The United States allocated among the Village Corporations approximately 22 million acres of surface estate in Alaska land. The underlying subsurface estate of this territory, and both the surface and subsurface estate in an additional 16 million acres, were allocated among the Regional Corporations. *See* §§ 1611, 1613; *see also Koniag, Inc. v. Koncor Forest Resource,* 39 F.3d 991, 995 (9th Cir.1994). Each native Alaskan enrolled in one of the twelve regions (pursuant to section 1604) and received stock in the coordinate Regional Corporation (pursuant to section 1606(g)).

ANCSA requires the twelve Regional Corporations to share revenues as follows:

> 70 percent of all revenues received by each Regional Corporation *from the timber resources and subsurface estate patented to it pursuant to this chapter* shall be divided annually by the Regional Corporation among all twelve Regional Corporations organized pursuant to this section according to the number of Natives enrolled in each region pursuant to section 1604 of this title.

§ 1606(i)(1)(A) (emphasis added). The 30% of section 1606(i)(1)(A) revenues that a Re-

---

**1.** All references to the complaint in this opinion and order are to plaintiff's second amended complaint (Compl.), filed by leave of the court on November 2, 1999.

**2.** Unless otherwise noted, section citations are to sections of ANCSA as amended and codified at 43 U.S.C. §§ 1601–1629(f) (1994 & Supp. III 1997).

**3.** On August 20, 1999, plaintiff moved for class certification pursuant to RCFC 23. The court granted defendant's motion to stay consideration of the motion, holding that a stay pending a ruling on defendant's motion to dismiss would serve the need for judicial economy without prejudicing the rights of absent class members. The court's dismissal of plaintiff's complaint renders its motion for class certification moot. *See Greenbrier v. United States,* 193 F.3d 1348, 1360 (Fed.Cir.1999) ("[Plaintiffs] ... appeal the trial court's order denying the certification of a class .... This issue is moot in light of our holdings that the government is not liable to the [plaintiffs] ...."). Accordingly, plaintiff's motion for class certification is denied.

gional Corporation keeps, plus its share of section 1606(i)(1)(A) shared revenues, comprise a Regional Corporation's total section 1606(i) revenue.

ANCSA also requires each Regional Corporation to distribute first 45%, then 50%, of its section 1606(i) revenues (and net income) among: (1) the Village Corporations within its region and (2) any Regional Corporation shareholders who are not also residents of a Village (at-large shareholders). *See* § 1606(j).

From 1984 until 1988, Congress, under the Internal Revenue Code, allowed Native Corporations to sell net operating loss (NOL) deductions to for-profit corporations. *See* Deficit Reduction Act, Pub.L. No. 98–369, § 60(b), 98 Stat. 494, 579 (1984) (codified at note following 26 U.S.C. § 1504 (Supp. II 1984)) (providing an exception to § 60(a)); Tax Reform Act of 1986, Pub.L. No. 99–415, § 1804(e)(5), 100 Stat.2085, 2801 (1986) (codified at note following 26 U.S.C. § 1504 (Supp. IV 1986)) (clarifying purpose of § 60(b) "to quash Internal Revenue Service resistance to this" exception, *Bay View Inc. v. AHTNA Inc.*, 105 F.3d 1281, 1283 (9th Cir.1997)); Technical & Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, § 5021, 102 Stat. 3342, 3666 (1988) (codified at note following 26 U.S.C. § 1504 (1988)) (repealing the program created by the 1984 and 1986 Acts).

The tax basis of a Native Corporation's lands is equal to the fair market value of the land at the time of transfer. *See* § 1620(c). When transfer occurred in the late 1970s, commodity prices were at all-time highs, so the lands carried "artificially high tax bases and thus generated huge tax losses when sold in the mid–1980s." *Bay View*, 105 F.3d at 1284 n. 2. For example, a Native Corporation might sell timber resources for $10 million, whereas its basis, calculated according to value at the time of transfer, might be $110 million, $100 million more than the sale price. The latter amount could be claimed as an NOL deduction.

The tax program allowed an Alaska Native Corporation to affiliate with a profitable corporation and apply its NOL against the affiliated corporation's taxable income. "If the [profitable] corporation was in the 34% tax bracket, it would save $34 in taxes for each $100 loss it bought. The profitable corporation [then might] pay [approximately] $30 to the Native corporation for the $100 loss." *Bay View*, 105 F.3d at 1283. In this fashion, Alaska Native Corporations sold approximately $1.5 billion in NOL deductions, and generated for themselves about $425 million in NOL revenue. *Id.* at 1284.

In 1990, ten Regional Corporations entered into a mutual assistance agreement not to share their NOL revenues, and to seek an amendment to ANCSA that would exempt the NOL revenues from section 1606(i)'s sharing requirement. *Bay View*, 105 F.3d at 1284; Compl. ¶ 25. Plaintiff sued in Federal District Court for a share of the unshared NOL revenues. *Bay View*, 105 F.3d at 1284. The district court dismissed for failure to state a claim upon which relief could be granted, because ANCSA did not give plaintiff an implied right of action to enforce section 1606(i) sharing against the Regional Corporations. *See Bayview, Inc. v. AHTNA, Inc.*, No. A94–0551 CV (D.Alaska July 7, 1995); *Bay View*, 105 F.3d at 1284, 1286; *see also Oliver v. Sealaska Corp.*, 192 F.3d 1220, 1223–25 (9th Cir.1999) (ANCSA gave at-large shareholder no express or implied private right of action to enforce sharing among the Regional Corporations).

On November 2, 1995, while the case was on appeal to the Ninth Circuit, an amendment to section 1606(i) was signed into law, adding paragraph (2), which provides:

> For purposes of this subsection, the term "revenues" does not include any benefit received or realized for the use of losses incurred or credits earned by a Regional Corporation.

*See* Pub.L. No. 104–42, § 109, 109 Stat. 353, 357 (codified at § 1606(i)(2)). The Ninth Circuit affirmed the district court, holding that Congress had taken away whatever rights plaintiff might have had to share in the NOL revenues, but expressing "no view as to whether [Bay View] had a property right that was destroyed by Congress; that is a question that will have to be answered by the Court of Federal Claims, if appellants choose

to bring suit there." *Bay View,* 105 F.3d at 1286.[4]

## DISCUSSION

### Standard of Review

All federal courts are courts of limited jurisdiction, and the court must consider its jurisdiction before it considers the merits of a claim. *See Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). The jurisdiction of the United States Court of Federal Claims is limited "to the metes and bounds of the United States' consent to be sued in its waiver of [sovereign] immunity." *RHI Holdings, Inc. v. United States,* 142 F.3d 1459, 1461 (Fed.Cir.1998) (citing *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). In evaluating a motion to dismiss, the court construes all allegations in favor of the non-moving party. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The ultimate burden of establishing jurisdiction rests on plaintiff. *See Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991).

The Court of Federal Claims has jurisdiction over claims that fall within the terms of the Tucker Act, 28 U.S.C. § 1491 (1994 & Supp. III 1997) (Tucker Act), and its counterpart for claims brought by Indian tribes, 28 U.S.C. § 1505 (1994) (Indian Tucker Act). *See United States v. Mitchell,* 463 U.S. 206, 215–16, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). However, neither jurisdiction-granting act "create[s] any substantive right enforceable against the United States for money damages." *Id.* at 216, 103 S.Ct. 2961 (internal quotations omitted). Accordingly, "the claimant must demonstrate that the source of substantive law he relies upon 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'" *Id.* at 216–17, 103 S.Ct. 2961 (quoting *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)).

The court may dismiss a complaint pursuant to RCFC 12(b)(4) for failure to state a claim upon which relief may be granted "where the plaintiff can prove no set of facts that would support its claim." *New York Life Ins. Co. v. United States,* 190 F.3d 1372, 1377 (Fed.Cir.1999); *see also Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); RCFC 12(b)(4). Because granting a 12(b)(4) motion to dismiss "summarily terminates the case on its merits," the court "must accept the plaintiff's factual allegations in the complaint as true, drawing all inferences in favor of the plaintiff." *Ponder v. United States,* 117 F.3d 549, 552–53 (Fed.Cir.1997).

### Count I: Taking

■ "A taking compensable under the Fifth Amendment inherently requires the existence of 'private property.' As part of a takings case, the plaintiff must show a legally-cognizable property interest." *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1580 (Fed.Cir.1993) (citing *United States ex rel. Tennessee Valley Auth. v. Powelson,* 319 U.S. 266, 281, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943)); *see also Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976) (holding that Congress could amend an Indian allotment act without paying compensation for a taking because the allotment act had not granted plaintiffs a vested property interest).

■ The court concludes, on the basis of section 1606(i)'s plain language, that NOL revenues were not shareable revenues under section 1606(i) as enacted. Legislative history and prior judicial interpretations of shareable revenues confirm this interpretation. Accordingly, plaintiff had no property interest in the NOL revenues, and Congress took nothing when it enacted the 1995 amendment clarifying that NOL revenues were not shareable revenues. Thus, plaintiff fails to state a claim upon which relief can be granted. The reasoning behind this conclusion follows.

---

4. The Ninth Circuit Court of Appeals' conclusion that plaintiff is "clearly ... entitled to bring a Tucker Act claim because Congress did not explicitly preclude such suits when it enacted ANCSA," *Bay View,* 105 F.3d at 1285, mistakes the basis for this court's subject matter jurisdiction. Lack of explicit statutory preclusion of suit alone does not establish subject matter jurisdiction. Rather, the test is whether the requirements of the Tucker Act are satisfied.

Under ANCSA, a Regional Corporation's revenue is shareable if "received ... from the timber resources and subsurface estate patented to it pursuant to this chapter." § 1606(i). By its plain language, only revenues received by a Regional Corporation "from" the timber resources and subsurface estate are shareable. As a corollary, revenues received by a Regional Corporation that are not "from" the timber resources and subsurface estate patented to it are not shareable.

The legislative history of the section 1606(i) sharing requirement confirms this interpretation. *See, e.g., Delverde, SrL v. United States*, 202 F.3d 1360, 1366–67 (Fed. Cir.2000) (considering legislative history that confirmed a statute's plain meaning). Congress included section 1606(i) "to distribute more evenly among all Natives the benefits of" the disparate land grants made to each Village and Regional Corporation. *Chugach Natives, Inc. v. Doyon, Ltd.*, 588 F.2d 723, 731 (9th Cir.1979) (discussing Congressional intent found in section 1601(a),(b) and ANCSA's legislative history). However, the legislative history makes clear that the sharing provision does "not apply to revenues received by the Regional Corporations from their investment in business activities." Conf. Rep. No. 92–746, 92th Cong., 1st Sess (1971), reprinted in 1971 U.S.C.C.A.N. 2247, 2249. Therefore, once timber resources or subsurface estate were sold and the revenues shared, Congress did not intend that revenues received by a Regional Corporation from subsequent business activities be shared.

This interpretation is consistent with other judicial interpretations of shareable revenue under section 1606(i).

> [R]evenues received by a Regional corporation that are attributable to, directly related to, or generated by the acquisition of an interest in the corporation's subsurface estate are revenues subject to the sharing provisions of section [1606(i)].

*Aleut Corp. v. Arctic Slope Regional Corp.*, 484 F.Supp. 482, 485 (D.Alaska 1980). Revenues are shareable if they are received by a Regional Corporation from another that acquires an interest in the Regional Corpora-

tion's subsurface estate (or timber resources). Other revenues are not shareable under section 1606(i).

NOLs were generated by Regional Corporations when they entered into business transactions that conveyed an interest in timber resources or subsurface estate to another corporation at below the adjusted tax basis of the conveyed resources. The "complicated transaction[s] with [profitable corporations] in accord with the applicable IRS requirements," Compl. ¶ 15, which turned the NOLs into revenue sources, conveyed no interest in the Regional Corporation's timber resources or subsurface estate. They are separate transactions. Again, the revenue generated is not "from" conveyance of an interest in the Regional Corporation's timber resources or subsurface estate, but, rather, the result of the Regional Corporation's investment in business activities with a profitable corporation.

Because NOL proceeds are not revenues "from" conveyance of an interest in timber resources or subsurface estate, they never were subject to section 1606(i)'s sharing requirement. Accordingly, (1) plaintiff had no property interest pursuant to section 1606(i) in the NOL proceeds of the Regional Corporations; (2) Congress took nothing by enacting the 1995 clarifying amendment adding section 1606(i)(2); and (3) plaintiff's taking claim based on sections 1606(i) and 1606(j) fails to state a claim upon which relief can be granted. *See Skip Kirchdorfer*, 6 F.3d at 1580 (a legally cognizable property interest is a necessary part of a takings claim).

### Count II: Breach of Trust

Plaintiff alleges that Congress breached its fiduciary duty to plaintiff by amending section 1606(i) in 1995.

■ The United States Government has a "general trust relationship" with native Americans. *Mitchell*, 463 U.S. at 225, 103 S.Ct. 2961. However, this court's jurisdiction over a claim of government breach of trust requires "a statute that creates a trust relationship and mandates the payment of money for damages stemming from the breach of that trust relationship." *Seldovia*

*Native Assoc., Inc. v. United States,* 144 F.3d 769, 784 (Fed.Cir.1998). In the absence of a provision that expressly creates liability for breach, a statute creating a trust is money-mandating only when it "clearly establish[es] fiduciary obligations of the Government in the management and operation of the Indian lands and resources ...." *Mitchell,* 463 U.S. at 226, 103 S.Ct. 2961. Plaintiff cites no such provision.

"[A] fiduciary relationship necessarily arises when the Government assumes ... elaborate control over ... property belonging to Indians." *Id.* at 225, 103 S.Ct. 2961. ANCSA is devoid of language creating such a relationship.

■ This court's and the Federal Circuit's interpretation of ANCSA is confirmed by its legislative history. "The text and legislative history of ANCSA make clear that Congress sought to *avoid* creating any fiduciary relationship between the United States and any Native organization." *Seldovia,* 144 F.3d at 784 (emphasis added).

ANCSA thus is not a money-mandating statute. *Id.* Accordingly, any breach of trust claim based on ANCSA is not within this court's jurisdiction. *See United States v. Mitchell,* 445 U.S. 535, 546, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (holding that there is no Tucker Act or Indian Tucker Act jurisdiction when the statute creating the trust does not create a fiduciary management responsibility because such a statute is not money-mandating).

### Count III: Breach of Contract/Treaty

Plaintiff alleges that ANCSA embodies the terms of an implied contract or treaty by which Congress extinguished aboriginal title to land and waters in exchange for, among other things, the right to share in resource exploitation. Plaintiff claims that defendant breached this contract or treaty by unilaterally altering ANCSA's terms. These allegations fail to state a claim upon which relief can be granted.

■ This court has jurisdiction under the Tucker Act when a plaintiff makes "a non-frivolous assertion of [a] ... contract with the United States." *City of Cincinnati v. United States,* 153 F.3d 1375, 1377 (Fed.Cir. 1998). In order to state a claim upon which relief can be granted, however, the complaint must allege a relationship based upon " 'mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government.' " *Massie v. United States,* 166 F.3d 1184, 1188 (Fed.Cir.1999) (quoting *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1326 (Fed.Cir.1997)).

■ ANCSA clearly is a statute, not a contract. ANCSA is "a comprehensive statute designed to settle all land claims by Alaska Natives." *Native Village of Venetie Tribal Gov't,* 522 U.S. at 523, 118 S.Ct. 948. Congress did not "offer" to settle native Alaskans' land claims, nor was their "acceptance" required; rather, Congress unilaterally extinguished "all aboriginal titles," § 1603(b), and "[a]ll claims against the United States ... based on claims of aboriginal right, title, use, or occupancy." § 1603(c).

Although Congress granted Alaska natives money and land at the same time that it extinguished aboriginal titles and claims, the extinguishment could not constitute consideration because the native Alaskans' aboriginal titles and claims created " 'no right against taking or extinction by the United States protected by the Fifth Amendment or any other principle of law.' " *Inupiat Community,* 680 F.2d at 128 (quoting *Tee–Hit–Ton Indians v. United States,* 348 U.S. 272, 285, 75 S.Ct. 313, 99 L.Ed. 314 (1955)). Nor is ANCSA a settlement agreement of a specific dispute that could be a contract within the meaning of the Tucker Act. *See Angle v. United States,* 709 F.2d 570, 573 (9th Cir. 1983). ANCSA also does not direct or authorize any part of the executive branch to enter into a contract with native Alaskans. *Cf. Babbitt v. Oglala Sioux Tribal Pub. Safety Dep't,* 194 F.3d 1374, 1376 (Fed.Cir.1999). Authority to contract is a prerequisite for any contract sued upon in this court. *See Massie,* 166 F.3d at 1188; *Trauma Serv.,* 104 F.3d at 1326.

■ This court enjoys jurisdiction over claims of breach of a treaty. *See* 28 U.S.C. § 1491(a); 28 U.S.C. § 1505 ("The United

States Court of Federal Claims shall have jurisdiction of any claim against the United States ... whenever such claim is one arising under the ... treaties of the United States."). ANCSA, however, is not a treaty. It literally could not be a treaty, since, in 1871, *see* Act of Mar. 3, 1871, 16 Stat. 554, 566 (codified as amended at 24 U.S.C. § 71 (1994)), Congress "abrogated the contract-by-treaty method of dealing with Indian tribes." *Antoine v. Washington,* 420 U.S. 194, 201–02, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975). Plaintiff does not even allege that ANCSA was an act of Congress "legislating the ratification of contracts of the Executive Branch with Indian tribes" that have substituted for treaties since that time. *Id.* at 203, 95 S.Ct. 944.

Because ANCSA is neither a money-mandating contract nor a ratified or enforceable treaty, plaintiff can prove no set of facts that would support its breach of contract/treaty claims. Accordingly, they fail to state a claim upon which relief can be granted. *New York Life,* 190 F.3d at 1377.

In its opposition to defendant's motion to dismiss, plaintiff appears to regard its breach of contract/treaty claim as another takings claim. However, again, because ANCSA is neither a contract nor a treaty, it created no contractual property interest that could be taken by Congress' 1995 amendment of ANCSA. *See United States v. Jim,* 409 U.S. 80, 81–83, 93 S.Ct. 261, 34 L.Ed.2d 282 (1972) (non-contractual statute allotting benefits of mineral deposits among Indians could be amended without being a taking).

Moreover, even if ANCSA were a contract or a treaty, this court's determination that section 1606(i) never required sharing of NOL revenues necessarily disposes of plaintiff's contract and treaty-based takings claims. Because section 1606(i) did not require sharing, Congress' 1995 amendment clarifying section 1606(i) by adding subsection 1606(i)(2) did not alter plaintiff's rights.

### *CONCLUSION*

Count I of plaintiff's complaint is dismissed for failure to state a claim upon which relief can be granted, because plaintiff had no property interest in Regional Corporations' NOL revenues pursuant to sections 1606(i) and (j) as enacted. Count II of plaintiff's complaint is dismissed for lack of jurisdiction, because ANCSA is not a money-mandating statute. Count III of plaintiff's complaint is dismissed for failure to state a claim upon which relief can be granted, because ANCSA was neither a contract nor a treaty, and because no contract or treaty rights, if any, were taken. Defendant's motion to dismiss is granted.