265 F.3d 1237 (Fed. Cir. 2001)
 CIENEGA GARDENS, CLAREMONT VILLAGE COMMONS, COVINA WEST APARTMENTS, DEL AMO GARDENS, DEL VISTA VILLAGE, DESOTO GARDENS, INDEPENDENCE PARK APARTMENTS, KITTRIDGE GARDENS I, KITTRIDGE GARDENS II, LAS LOMAS GARDENS, OXFORD PARK, PARTHENIA TOWNHOMES, PIONEER GARDENS, PUENTE PARK APARTMENTS, RAYEN PARK APARTMENTS, RESEDA PARK APARTMENTS, ROSCOE PARK APARTMENTS, ST. ANDREWS GARDENS, SAN JOSE GARDENS, SHERMAN PARK APARTMENTS, SUNLAND PARK APARTMENTS, ARGONAUT APARTMENTS, BECK PARK APARTMENTS, BLOSSOM HILL APARTMENTS, CASA SAN PABLO, CENTRAL PARK APARTMENTS, DREHMOOR APARTMENTS, FAIRVIEW GREEN APARTMENTS, GENESSEE PARK APARTMENTS, GRACE & LAUGHTER APARTMENTS, GREEN HOTEL, HOLLYWOOD KNICKERBOCKER APARTMENTS, HOLLYWOOD PLAZA, KINGS CANYON APARTMENTS, LAWRENCE ROAD APARTMENTS, LIVERMORE GARDENS, PALO ALTO GARDENS, PICO PLAZA APARTMENTS, PLACITA GARDEN APARTMENTS, SKYLINE VIEW GARDENS, VILLA FONTANA, and VILLAGE GREEN, Plaintiffs-Appellants,
v.
UNITED STATES, Defendant-Appellee.
 No. 00-5104
 United States Court of Appeals for the Federal Circuit
 DECIDED: September 18, 2001
 
 Appealed from: United States Court of Federal Claims, Judge Robert H. Hodges, Jr.
 Evertt C. Johnson, Jr., Latham & Watkins, of Washington, DC, argued for plaintiffs-appellants. With him on the brief were Richard P. Bress, Leonard A. Zax, and Matthew R. Lewis.
 John E. Kosloske, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief was David M. Cohen, Director. Of counsel on the brief were Carole W. Wilson, Associate General Counsel; Angelo Aiosa, Assistant General Counsel; and Terri L. Roman, Trial Attorney, Office of General Counsel, Department of Housing and Urban Development, of Washington, DC.
 Before MICHEL, RADER, and LINN, Circuit Judges.
 MICHEL, Circuit Judge.
 
 
 1
 This is a takings case. Appellants are forty-two partnerships ("Owners") formed to develop and operate residential apartment buildings, primarily in California. Owners' claims arise from Congress' enactment of the Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, 101 Stat. 1877 (1987) (pertinent parts reprinted in 12 U.S.C. 1715l, note (1994) (Preservation of Low Income Housing) ("ELIHPA") and the Low-Income Housing Preservation and Resident Home ownership Act of 1990 (codified at 12 U.S.C. 4101-4147 (1994)) ("LIHPRHA"), both of which prohibited the prepayment of Owners' federally subsidized mortgage loans after 20 years without pre-approval from the Department of Housing and Urban Development ("HUD"). Asserting that ELIHPA and LIHPRHA abrogated their contractual rights to prepay their mortgages (and thus to convert their federally regulated housing into market-rate residences), Owners sued the United States on January 3, 1994 for breach of contract, for just compensation under the Takings Clause of the Fifth Amendment, and for allegedly unlawful administrative actions.
 
 
 2
 On March 27, 1995, the U.S. Court of Federal Claims granted summary judgment in favor of the Owners on their breach of contract claims, but denied their motion for summary judgment on their takings claims. The court dismissed their administrative law claims for lack of jurisdiction. Cienega Gardens v. United States, 33 Fed. Cl. 196 (1995). Four model plaintiffs (Sherman Park Apartments, Independence Park Apartments, St. Andrews Garden Apartments, and Pico Plaza Apartments, collectively "Model Plaintiffs") were selected for the purposes of litigating the damages trial on the breach of contract claim. The trial court awarded the Model Plaintiffs $3,061,107 and entered judgment in their favor pursuant to Fed. R. Civ. P. 54(b). Cienega Gardens v. United States, 38 Fed. Cl. 64 (1997). After the government appealed the breach of contract issue, we vacated and remanded the case, finding no privity of contract between the Owners and the United States with respect to the right to prepay the mortgages after twenty years. Cienega Gardens v. United States, 194 F.3d 1231 (Fed. Cir. 1998).
 
 
 3
 On remand, the trial court granted summary judgment in favor of the government that the Owners' takings claims were not ripe. Finding the case controlled by Greenbrier v. United States, 193 F.3d 1348 (Fed. Cir. 1999), the court ruled that the Owners were required to request permission from HUD to prepay their mortgages, and thus exhaust their administrative remedies, before their takings claims would be justiciable. Cienega Gardens v. United States, 46 Fed. Cl. 506 (2000). The Owners filed a timely notice of appeal to this court, and we heard oral argument on July 13, 2001. Because the trial court's findings during the damages trial of the breach of contract action, as well as the United States' own housing data, conclusively establish that HUD would have had no discretion under the statutory requirements of ELIHPA and LIHPRHA to permit the owners to prepay their mortgages, we conclude that it would have been futile for the Owners to file prepayment requests with HUD. Accordingly, we hold that the takings claims of the four Model Plaintiffs were ripe for review. We reverse and remand the summary judgment insofar as it rested upon unripeness for failure to exhaust administrative remedies. This case falls squarely into the futility exception. But, insofar as the summary to the government rests on rejection of the Owners' per se taking theory, we affirm.
 
 BACKGROUND
 
 4
 As discussed in detail in the prior opinions of this court and the trial court in this case, the present dispute arises out of federal legislation enacted in the 1950s and 1960s to encourage private developers to construct, own, and manage housing projects for low- and moderate-income families. To implement this legislation, Congress authorized the Federal Housing Administration, and later HUD, to provide mortgage insurance to enable private lending institutions to provide low-interest mortgages to housing developers.
 
 
 5
 Typically, when a developer received a HUD-insured mortgage, the developer signed a long-term deed of trust note with a private lender. HUD would then endorse the note. In 1970-1972, the Model Plaintiffs, all HUD-approved mortgagees, each executed 40-year deed of trust notes. These deed of trust notes bore a "Rider A" agreement. Importantly, Rider A to the HUD-endorsed deed of trust notes expressly prohibited prepayment of the mortgages before 20 years from the date of endorsement, except under certain conditions which included HUD approval of the prepayment. The riders further stated that, after making payments for 20 years, owners may prepay their mortgages in full without prior HUD approval. For example, Rider A to the Sherman Park Apartments deed of trust note provided in relevant part:
 
 
 6
 The debt evidenced by this Deed of Trust may not be prepaid in whole or in part, prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner, except a maker which is a limited distribution mortgagor may prepay without such approval after twenty (20) years from the date of final endorsement of this Deed of Trust Note by the Federal Housing Commissioner.
 
 
 7
 (emphasis added). Simultaneously with entering into the deed of trust notes, the developers entered into "regulatory agreements" with HUD, which placed certain conditions on the mortgagors. The regulatory agreements imposed restrictions on the operation of the projects, including: the income levels of tenants; the maximum rents that could be charged; and the rates of return that the developer could receive (collectively, "affordability restrictions"). These agreements, as well as the mortgage insurance provided by HUD, were to remain in effect as long as the mortgage loan remained outstanding. However, they contained no reference to the Owners' right to prepay their mortgages after 20 years.
 
 
 8
 The regulations in place in 1970 provided that participating Owners could prepay their mortgage upon the expiration of 20 years. See, e.g., 24 C.F.R. 221.524(a) (1970) (enumerating circumstances under which "mortgage indebtedness may be prepaid in full" after 20 years). The regulations, however, were subject to amendment, so long as the interest of the mortgagee or lender under existing mortgages or loans was not adversely affected. See 24 C.F.R. 221.749 (1970) ("The regulations in this subpart may be amended by the Commissioner at any time and from time to time, in whole or in part, but such amendment shall not adversely affect the interests of a mortgagee or lender on any mortgage or loan to be insured on which the Commissioner has made a commitment to insure.").
 
 
 9
 By the late 1980s, Congress had become concerned that a large number of owners might take advantage of the prepayment clauses, thus reducing the supply of low-income housing throughout the country. See S. Rep. No. 101-316 at 105 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5867. As a result, Congress enacted two pieces of legislation. The first, ELIHPA, was enacted in 1987, prohibiting participating owners from prepaying their mortgages absent prior approval from HUD. ELIHPA 225(a), 12 U.S.C. 1715l, note. ELIHPA authorized HUD to approve a prepayment only after making written findings that the prepayment would have minimal effects on the existing tenants, the local low-income housing market in general, and the local housing market for minorities. Id. ELIHPA also authorized HUD to offer owners incentives to maintain the affordability restrictions on their properties. Id. at ELIHPA 225(b).
 
 
 10
 In 1990, Congress enacted LIHPRHA, superseding ELIHPA. LIHPRHA, like ELIHPA, authorized HUD to provide incentives to owners to maintain the affordability restrictions on their properties. See Pub. L. No. 101-625, 104 Stat. 4249, codified at 12 U.S.C. 4101-4147 (1994). LIHPRHA also prohibited participating owners from prepaying their mortgages after 20 years absent approval of HUD. To request such approval, an owner must file a Notice of Intent ("NOI") with HUD. 12 U.S.C. 4102(a). The property must then be appraised by two independent appraisers to determine its "preservation value," which in turn becomes a basis for any incentives that are ultimately offered to the owners to induce them to maintain affordability restrictions on the properties. 12 U.S.C. 4103; see also id., 4104(a), 4110(d). Within nine months after receiving an NOI (or six months if the NOI proposes to terminate affordability restrictions), HUD must send the owner a report containing the results of the appraisals and other information necessary for the owner to proceed. 12 U.S.C. 4106. The owner must then, within six months, file a Plan of Action with HUD, indicating whether the owner wishes to prepay the mortgage (terminating the affordability restrictions), extend the affordability restrictions by requesting incentives, or sell the property to a buyer who will agree to maintain the affordability restrictions. 12 U.S.C. 4107.
 
 
 11
 LIHPRHA further provides that HUD may approve a request for termination of affordability restrictions through prepayment of the mortgage only upon its making a written finding that implementing the plan will not materially increase "economic hardships" on existing tenants, involuntarily displace such tenants, or decrease the availability of decent, safe, sanitary low-income housing. 12 U.S.C. 4108. In particular, section 4108(a) precludes HUD from approving a prepayment request unless it finds that:
 
 
 12
 (1) implementation of the plan of action will not --
 
 
 13
 (A) materially increase economic hardship for current tenants, and will not in any event result in (i) a monthly rental payment by any current tenant that exceeds 30 percent of the monthly adjusted income of the tenant or an increase in the monthly rental payment in any year that exceeds 10 percent (whichever is lower), or (ii) in the case of a current tenant who already pays more than such percentage, an increase in the monthly rental payment in any year that exceeds the increase in the Consumer Price Index or 10 percent (whichever is lower); or
 
 
 14
 (B) involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement; and
 
 
 15
 (2) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect --
 
 
 16
 (A) the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families or persons in the area that the housing could reasonably be expected to serve;
 
 
 17
 (B) the ability of low-income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or
 
 
 18
 (C) the housing opportunities of minorities in the community within which the housing is located.
 
 
 19
 12 U.S.C. 4108 (1994). Commentators have expressed the view that the requirements for allowing HUD to approve a prepayment request would be met in only the rarest of circumstances. See, e.g., Sheldon P. Winkelman, Low-Income Housing Preservation and Resident Ownership Act of 1990, 73 Mich. B.J. 1160, 1161-62 (1994) ("It is generally felt that it would require an extremely unique set of facts and circumstances to lead to HUD's granting permission for prepayment; that is, all areas arguably need low-income housing . . . Therefore, the option of prepayment is probably a fiction.").
 
 
 20
 One important factor in evaluating eligibility for prepayment is whether conversion of the Model Plaintiff's properties to market rentals would have caused the current tenants' rents to increase by more than 10%, thereby inflicting "material economic hardship" as defined by 4108(a)(1)(A)(i), and thus strictly and expressly precluding HUD from approving a prepayment request. As set forth in the parties' Joint Stipulation of Facts, during the mid-1990s, after their original 20-year prepayment dates had expired, the four Model Plaintiffs each submitted Plans of Action to HUD seeking incentives under ELIHPA or LIHPRHA. As part of the process of offering incentives, HUD determined the market rate for apartments at the Owners' locations. With Sherman Park, St. Andrews Gardens, and Independence Park, HUD completed formal determinations of the prevailing market rental value of such apartments and approved the owners' plans of action for receiving incentives. Pico Plaza also submitted a Plan of Action seeking incentives under LIHPRHA. Although Pico Plaza never progressed far enough into HUD's process for obtaining a final "Form 9607" determination, HUD commissioned an appraisal that was completed on August 25, 1995. Based on HUD's own data, as set forth in the Joint Stipulation of Facts, the Owners have composed the following table setting forth the HUD-restricted monthly rent at the four Model Plaintiffs' properties, the market rent as established by HUD, and the percent increase over HUD-restricted monthly rents. "B.R." stands for "bedroom."
 
 
 21
 _______________________________________________________________________________
 Percent Increase
 Market Rent Over HUD - 
 HUD-Restricted as Established by Restricted Monthly 
 Monthly Rent HUD Rent
Property (A) (B) (B-A)/A
_______________________________________________________________________________
Sherman Park 1 B.R. = $356 1 B.R. = $600 1 B.R. = 69%
_______________________________________________________________________________
St. Andrews
Gardens 1 B.R. = $349 1 B.R. = $605 1 B.R. = 73%
_______________________________________________________________________________
 2 B.R. = $443 2 B.R. = $720 2 B.R. = 63%
_______________________________________________________________________________
 3 B.R. = $479 3 B.R. = 850 3 B.R. = 77%
_______________________________________________________________________________
Independence Park 1 B.R. = $320 1 B.R. = $545 1 B.R. = 70% 
_______________________________________________________________________________
 2 B.R. = $365 2 B.R. = $650 2 B.R. = 78%
_______________________________________________________________________________
Pico Plaza 1 B.R. = $416-454 1 B.R. = $520 1 B.R. = 15-25%
_______________________________________________________________________________
 
 
 22
 _______________________________________________________________________________
 Percent Increase
 Market Rent Over HUD - 
 HUD-Restricted as Established by Restricted Monthly 
 Monthly Rent HUD Rent
Property (A) (B) (B-A)/A
_______________________________________________________________________________
 2 B.R. = $495-522 2 B.R. = $630 2 B.R. = 21-27%
________________________________________________________________________________
 
 
 23
 Importantly, it is undisputed that, based on HUD's best estimates of prevailing market rates, allowing the four Model Plaintiffs to charge market rate rents would uniformly cause the monthly rent of those owners' tenants to increase by more than 10%. Indeed, in most cases, the rents would rise from between 63% and 78%.
 
 
 24
 LIHPRHA also prohibits HUD from approving prepayment requests when the supply of vacant, comparable housing is insufficient to allow termination of the affordability restrictions without materially affecting the availability of decent, safe, and sanitary housing. 12 U.S.C. 4108(a)(2). Addressing this issue, Carole Glodney, President of G&K Management Co., Inc. (the Owners' management company), submitted an uncontested declaration that the demand for low-income rental housing exceeded the supply in the Los Angeles communities within which the Model Plaintiffs' properties were located. Specifically, Glodney attested that each of these properties operated at full occupancy and had a waiting list of interested low-income tenants, and that other low-income rental properties that G&K managed in the vicinity of the properties likewise were operating at full occupancy and had waiting lists. James Tahash, who had formerly served as Division Director of the Planning and Procedures Division of HUD's Office of Multifamily Housing Management, and who was responsible for drafting the agency's implementing instructions and regulations for ELIHPA, stated in his declaration that "low-income properties in California, including Los Angeles or the surrounding areas, would not even arguably have been able to meet the statutory and regulatory requirements for approval of prepayment under ELIHPA or LIHPRHA."
 
 
 25
 The Owners did not file Plans of Action with HUD seeking prepayment under ELIHPA or LIHPRHA, asserting that it would have been futile to do so given the differentials between market rental rates and HUD-controlled rates, as well as the shortage of low-income housing in the communities where their properties were situated. Instead, the Owners sought other incentives available under ELIHPA and LIHPRHA. See ELIHPA 224; 12 U.S.C. 4109 (LIHPRHA). Glodney testified during the damages trial in the breach of contract claim that preparing a Plan of Action to receive the incentives was time-consuming and costly, and that it often took years for HUD to approve one. Sherman Park and St. Andrews Gardens eventually obtained tenant-based subsidies under ELIHPA that approximate market rents, in exchange for extending the affordability restrictions on their properties for another 20 years. Independence Park and Pico Plaza sought low-income preservation incentives under LIHPRHA, but later obtained approval to prepay their mortgages after Congress enacted the Housing Opportunity Program Extension Act of 1996, Pub. L. No. 104-120, 110 Stat. 834 ("HOPE Act").
 
 
 26
 As represented in the Owners' briefing, the Owners are now earning rents closer to market levels on their properties. However, the Owners allegedly received no reimbursement from the government for the fair-market rents to which they were entitled during the period between their 20-year anniversary dates and the dates on which they began receiving HUD funds under new use agreements (for Sherman Park and St. Andrews Gardens) or were permitted to prepay and convert to market rents under the HOPE Act (for Independence Park and Pico Plaza). The present suit seeks just compensation under the Takings Clause of the Fifth Amendment to recover the revenue lost during this period from the federal government's alleged taking of the Owners' rights to prepay their mortgages on the 20-year anniversary dates of their mortgages.
 
 
 27
 As stated above, the trial court granted the government's motion for summary judgment that the Owners' regulatory takings claims are unripe for failure to exhaust administrative remedies, and that the application of ELIHPA and LIHPRHA did not effect a per se taking of the Owners' property. For the reasons discussed below, we conclude that the regulatory takings claims of the four Model Plaintiffs were ripe for review, reversing the trial court as to the regulatory takings issue. The futility exception to the pre-approval process applies here. However, we agree with the trial court that, as a matter of law, the application of ELIHPA and LIHPRHA does not constitute a per se taking.
 
 DISCUSSION
 A. Standard of Review
 
 28
 This court must review the trial court's rulings on summary judgment de novo, construing the facts in the light most favorable to the Owners and giving the Owners the benefit of all reasonable inferences. See Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345 (Fed. Cir. 2000).
 
 B. Regulatory Takings
 
 29
 The Takings Clause of the Fifth Amendment prohibits the federal government from taking private property for public use without just compensation. U.S. Const. amend. V. A "regulatory taking" may occur when government action, although not encroaching upon or occupying private property, still affects and limits its use to such an extent that a taking occurs. Palazzolo v. Rhode Island, 121 S. Ct. 2448, 2457 (2001) (citing Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922)). The central issue presented by this appeal is whether the Owners' regulatory takings claims are ripe for review, despite the fact that the Owners never requested prepayment exemptions from HUD, and thus never obtained final decisions from HUD denying such requests.
 
 
 30
 The government insists that the Owners must first file Plans of Action with HUD, and receive final decisions from HUD denying their requests, before the Owners' takings claims ripen. The government relies on a wealth of cases, and especially those concerning land use restrictions, wherein the Supreme Court has held that a party alleging a regulatory taking must obtain a final decision from the governmental agency charged with administering challenged regulations before the claim is properly justiciable. The Court recently reiterated the "important principle that a landowner may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation." Palazzolo, 121 S. Ct. at 2459 (emphasis added); see also Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 186 (1985) ("[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the [land use] regulations has reached a final decision regarding the application of the regulations to the property at issue."); Agins v. Tiburon, 447 U.S. 255, 260 (1980) (holding that a challenge to the application of a zoning ordinance was not ripe because the property owners had not yet submitted a plan for development of their property).
 
 
 31
 In the context of these land use cases, seeking a final decision from the pertinent land use authority is essential to determining the existence and scope of the taking, allegedly due to the "high degree of discretion characteristically possessed by land-use boards in softening the strictures of the general regulations they administer." Palazzolo, 121 S. Ct. at 2459 (quoting Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725, 738 (1997)).Where agencies have discretion in administering regulations, the requirement that complainants pursue administrative solutions promotes the possibility that "a mutually acceptable solution might well be reached with regard to individual properties, thereby obviating any need to address the constitutional questions."Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., 452 U.S. 264, 297 (1981). Restated, where agencies have discretion, requiring a final administrative decision ensures that there has been an injury-in-fact. See Williamson, 473 U.S. at 193 ("[T]he finality requirement is concerned with whether the initial decision maker has arrived at a definitive position on the issue that inflicts an actual, concrete injury.").
 
 
 32
 The Owners contend that the final decision requirement is not applicable to them because it would be futile to submit a prepayment request to HUD, as HUD has no discretion under ELIHPA or LIHPRHA to grant such requests under the undisputed facts of their cases. The Owners rely in particular on Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725 (1997). Suitum concerned a land use plan to regulate development in the Lake Tahoe basin. Under the plan, once a parcel of land was deemed to fall within a "Stream Environment Zone" ("SEZ"), there could be no "additional land coverage or other permanent land disturbance" on such a parcel. Id. at 729 (citing Tahoe Regional Planning Agency Code of Ordinances 20.4). Bernadine Suitum purchased an undeveloped lot prior to enactment of the land use plan, and later (after the plan's implementation) applied to the regional planning agency for permission to construct a house on her lot. The agency determined that her property was located within an SEZ, and denied permission to build. Id. at 731. Suitum appealed to the agency's governing board, which also denied relief. Id. She made no effort to pursue other administrative remedies, such as determining the value of the "Transferable Development Rights" allocated to her under the land use plan. Id. The Supreme Court ruled that her claim was ripe for review, although she had not obtained a final decision from the agency to determine the allowable amount of development. The Court held that "[t]he demand for finality is satisfied by Suitum's claim, however, there being no question here about how the 'regulations at issue [apply] to the particular land in question.'" Id. at 739 (quoting Williamson County, 473 U.S. at 191). Moreover, the Court stated that "[b]ecause the agency has no discretion to exercise over Suitum's right to use her land, no occasion exists for applying Williamson County's requirement that a landowner take steps to obtain a final decision about the use that will be permitted on a particular parcel." Id.
 
 
 33
 Palazzolo recently reaffirmed the futility exception to the final decision rule. In that case, a landowner was not required to submit further applications to a local land use authority once it was determined that any request to fill the property owner's wetlands would be denied. The Court stated:
 
 
 34
 [O]nce it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened.
 
 
 35
 . . .
 
 
 36
 Ripeness doctrine does not require a landowner to submit applications for their own sake. Petitioner is required to explore development opportunities on his upland parcel only if there is uncertainty as to the land's permitted use.
 
 
 37
 121 S. Ct. at 2459-60. Moreover,
 
 
 38
 Where the state agency charged with enforcing a challenged land use regulation entertains an application from an owner and its denial of the application makes clear the extent of development permitted, and neither the agency nor a reviewing state court has cited non-compliance with reasonable state law exhaustion or pre-permit processes . . . federal ripeness rules do not require the submission of further and futile applications with other agencies.
 
 
 39
 Id. at 2462 (internal citation omitted). Other cases cited by the Owners also conclude that where an agency has no discretion in the application of a contested regulation, an aggrieved party does not need to obtain a final decision from the agency determining the scope of the regulation. See City Nat'l Bank of Miami v. United States, 30 Fed. Cl. 715, 720 (1994) ("Plaintiff is not required to pursue futile means to obtain a final determination."); Conant v. United States, 12 Cl. Ct. 689, 693 (1987) ("This Court believes that it would serve no purpose to require a claimant to exhaust administrative procedures before seeking judicial review when it is clear that resort to administrative action would be futile."); see also Del Monte Dunes at Monterey, Ltd. v. City of Monterey, 920 F.2d 1496, 1501 (9th Cir. 1990) ("Most recently, we excused as futile a landowner's failure to apply for a variance that the local government was powerless to grant."); Hoehne v. County of San Benito, 870 F.2d 529 (9th Cir. 1989) (finding claim ripe because plaintiff submitted uncontroverted affidavit that he was told that his application would be denied).
 
 
 40
 We conclude that that Owners present an even more compelling case of futility than in Suitum, Palazzolo, and the other land use cases cited above. Here, HUD lacks the "high degree of discretion characteristically possessed by land-use boards in softening the strictures of the general regulations they administer." Palazzolo, 121 S. Ct. at 2459 (quoting Suitum, 520 U.S. at 738). The prerequisites for HUD to grant a prepayment request are set forth by statute, and there is no allegation that HUD has any discretion to depart from these statutory requirements. Rather, section 4108 sets forth strict numerical criteria that must be met before HUD may exercise any discretion it has to approve prepayment requests. 12 U.S.C. 4108 (1994).
 
 
 41
 As recited above, HUD lacks discretion to grant a prepayment request unless (1) implementation of the plan will not materially increase economic hardship for current tenants; and (2) the supply of vacant, comparable housing is sufficient to ensure that prepayment will not materially affect the availability of decent, safe, and sanitary housing affordable to low-income persons in the area. As to the first prong, the Owners have compiled HUD's own data, tabulated above, to show that allowing the four Model Plaintiffs to charge market rate rents would uniformly cause the monthly rent of those owners' tenants to increase by more than 10%, which constitutes a material increase in economic hardship for existing tenants under 12 U.S.C. 4108(a)(1)(A). As to the second prong, the Owners have submitted uncontroverted affidavits attesting that allowing the four Model Plaintiffs to terminate their affordability restrictions would materially affect the supply of low-income housing in those communities. The government does not contest that, if these four Model Plaintiffs are allowed to charge market rents, the Model Plaintiffs will not be able to satisfy the criteria set forth in 4108(a) to obtain approval to prepay their mortgages.
 
 
 42
 The only arguable factual dispute in this case is whether the Los Angeles Rent Stabilization Ordinance ("LARSO") would limit the rents that the Owners could charge if they were able to prepay their mortgages and terminate their affordability restrictions under federal law. LARSO makes it "unlawful for any landlord to demand, accept or retain more than the maximum adjusted rent permitted pursuant to [LARSO] or regulations or orders adopted pursuant to [LARSO]." Cienega Gardens, 38 Fed. Cl. at 81-82 (quoting LARSO, Los Angeles Mun. Code 151.00 et seq.). LARSO, however, specifically excepts government-operated or exempted dwelling units or those subject to federal subsidization programs. Id. at 82. Moreover, LIHPRHA expressly prohibits any state or local law from restricting, inhibiting or otherwise interfering with the rights of participating property owners to prepay their existing mortgage balances as of the 20-year prepayment date. LIHPRHA provides:
 
 4122 Preemption of State and local laws
 
 43
 (a) In general. No state or political subdivision of a state may establish, continue in effect, or enforce any law or regulation that --
 
 
 44
 (1) restricts or inhibits the prepayment of any mortgage described in section 229(1) [12 U.S.C.S. 4119(1)] (or the voluntary termination of any insurance contract pursuant to section 229 of the National Housing Act [12 U.S.C.S. 1715t] on eligible low-income housing; ...
 
 
 45
 Any law, regulation, or restriction described under paragraph (1), (2), (3), or (4) shall be ineffective and any eligible low-income housing exempt from the law, regulation, or restriction, only to the extent that it violates the provisions of this subsection.
 
 
 46
 12 U.S.C. 4122(a).
 
 
 47
 During the damages trial in the breach of contract claim, the trial court concluded that LIHPRHA preempts LARSO, because the latter would "restrict or inhibit prepayment" of the Owners' mortgages, as the ongoing effect of LARSO "is to interfere materially with the intent of the federal subsidized housing program." Cienega Gardens, 38 Fed. Cl. at 85. The present appeal does not require us to rule upon whether LIHPRHA does indeed preempt LARSO. Nonetheless, the government's argument that LARSO withstands LIHPRHA's preemption clause is the government's last defense against a finding of administrative futility. For purposes of this appeal, we conclude, for all the reasons set forth by the trial court in the damages trial, that the government's arguments concerning the viability of LARSO are unconvincing as to the ripeness issue. Id. Whether LIHPRHA preempts LARSO is a matter of statutory interpretation. Jones v. Rath Packing Co., 430 U.S. 519, 526 (1977). It is entirely appropriate to permit the trial court to perform the preemption analysis in the first instance, rather than requiring the Owners to first submit this preemption question to the officials at HUD. We conclude that the Model Plaintiffs' claims are ripe, notwithstanding any remaining questions as to the applicability of LARSO.
 
 
 48
 The government's final argument, which the trial court found persuasive, is that our court has already ruled in Greenbrier v. United States, 193 F.3d 1348 (Fed. Cir. 1999), that the Owners must necessarily pursue administrative remedies with HUD and obtain final decisions on their requests before their takings claims may be properly justiciable. Indeed, Greenbrier concerned takings claims essentially identical to those in the present appeal. We held that the claims of the 249 owners of low-income housing projects were not ripe, as none had yet pursued statutory remedies with HUD to prepay their mortgages. We acknowledged the owners' complaints that HUD had set a "high hurdle" to allowing prepayment. Id. at 1359. However, we noted, according to the facts then-of-record, that HUD had approved prepayment proposals on three of the eight occasions on which such approval was sought. Id. at 1358. Because the facts showed that HUD did, indeed, have limited discretion to approve prepayment requests, we held that the 249 owners could not, as a group, forego the requirement to obtain a final decision from HUD prior to bringing suit for a taking. Id. at 1360. We nonetheless recognized that a claim could be ripe absent a prior, final decision from HUD "in the limited circumstance in which the administrative entity has no discretion regarding the regulation's applicability and its only option is enforcement." Id. at 1359 (citing Suitum, 520 U.S. at 738-40).
 
 
 49
 The four Model Plaintiffs in the present appeal, as opposed to the 249 owners in Greenbrier, have set forth uncontested facts demonstrating that it would be futile for them to file prepayment requests with HUD. Whereas our court in Greenbrier was required to determine the ripeness of the owners' claims without the aid of the facts of their particular circumstances, the four Model Plaintiffs have set forth a compelling case of administrative futility. Our conclusion that the takings claims of the four Model Plaintiffs are ripe is applicable only to the circumstances of the Model Plaintiffs and those other owners that demonstrate on a case-by-case basis in future proceedings that it would have been futile to submit prepayment requests to HUD. Under Greenbrier, we cannot hold that all forty-two of the Owners are entitled to proceed with their takings claims, as HUD may have discretion to grant some of the Owners' prepayment requests. On remand, the trial court will have to determine, under the applicable facts, whether each plaintiff has demonstrated that it would have been futile to apply to HUD for prepayment.
 
 C. Per Se Taking
 
 50
 The Owners further contend that they have suffered a per se taking, asserting that ELIHPA and LIHPRHA, by prohibiting prepayment except under conditions that the Owners could not meet, forced the Owners to use their properties to house government-approved, low-income tenants and prohibited the Owners from converting their properties to other uses. We disagree that ELIHPA and LIHPRHA give rise to a physical occupation of the Owners' property as required to show a per se taking. We agree with the trial court's ruling that "the effect of the prepayment restrictions . . . is merely to enhance an existing tenant's possessory interest," and that they do not authorize a "permanent physical occupation" of the Owners' property. Cienega Gardens, 33 Fed. Cl. at 217. Accordingly, we conclude that Yee v. City of Escondido, 503 U.S. 519 (1992), is controlling, and that the trial court properly granted summary judgment in favor of the government as to the Owners' claims for a per se taking.
 
 CONCLUSION
 
 51
 We conclude that the undisputed facts show that, if the four Model Plaintiffs had been allowed to convert their federally-regulated apartments into market-rate residences, the conversion would have imposed a materially increased economic hardship on the Model Plaintiffs' tenants, as defined by 12 U.S.C. 4108(a), and that such a conversion would reduce the supply of vacant, comparable housing available to those tenants. We find the government's arguments concerning LARSO unconvincing as to the ripeness issue, and thus we conclude it would have been futile for the four Model Plaintiffs to submit prepayment requests to HUD. Accordingly, the takings claims of the four Model Plaintiffs are ripe for adjudication. If the factual circumstances of any or all of the remaining Owners present a similarly compelling case of administrative futility, then the trial court should adjudicate their takings claims, as well. Thus, we reverse as to the ripeness of the Owners' regulatory takings claims. However, we affirm the trial court's grant of summary judgment in favor of the government on the Owners' claims for a per se taking.
 
 COSTS
 
 52
 Each party to bear its own costs.
 
 
 53
 AFFIRMED-IN-PART, REVERSED-IN-PART, and REMANDED